*Fernando Baires v. State of Maryland*, No. 955, September Term 2019.  Opinion by Wells, J.

**CRIMINAL LAW – RELEVANCY – STANDARD OF REVIEW**

Trial courts are afforded wide discretion to weigh relevant evidence.  Such determinations by the trial court will be upheld absent plain inadmissibility under a specific rule or principle of law or absent a clear abuse of discretion.

**CRIMINAL LAW – RELEVANCY – STANDARD OF REVIEW**

Appellate courts apply a de novo standard of review to determine whether evidence admitted by the trial court is relevant.

**CRIMINAL LAW – APPEALABILITY – TIMINING OF OBJECTIONS**

Non-immediate objection to the admission of testimony and accompanying exhibits does not preclude appealability of admission of the testimony and exhibits so long as an objection was made as soon as the grounds for objection became apparent according to Maryland Rule 4-323.

**CRIMINAL LAW – PARTICIPATION IN A CRIMINAL ORGANIZATION – PATTERN REQUIREMENT**

Conviction under Maryland CR § 9-804 does not require proof that the individual defendant had engaged in a pattern of criminal gang activity.  Conviction only requires that the defendant have knowledge that members of the organization, which may or may not comprise of the individual defendant, had engaged in a pattern of such activity.

**CRIMINAL LAW – APPEALABILITY – DEPTH OF ARGUMENT**

Arguments from a party's brief that are scant or even implicit are properly preserved for appeal.  However, arguments that are not presented whatsoever or not presented with particularity will not be considered on appeal.

**CRIMINAL LAW – PARTICIPATION IN A CRIMINAL ORGANIZATION – KNOWLEDGE REQUIREMENT**

In addition to proving the existence of a pattern of criminal gang activity, Maryland CR § 9-804 also requires proof that the criminal defendant possessed knowledge of that pattern.  In the absence of evidence of a criminal defendant's knowledge of a pattern of gang activity, the defendant cannot be convicted under Maryland CR § 9-804.

**CRIMINAL LAW – HARMLESS ERROR DOCTRINE – STANDARD OF REVIEW**

Errors of the trial court will be disregarded so long as those errors do not affect the essential fairness of the trial. In criminal appeals, we apply a "beyond a reasonable doubt" standard when determining whether an error of admission or exclusion of evidence is harmless.

**CRIMINAL LAW – HARMLESS ERROR DOCTRINE – EVIDENCE**

Evidence introduced solely for the purpose of proving the existence of a pattern of criminal gang activity—when admitted by the trial court in error due to the lack of evidence pertaining to the participation in a criminal gang statute's knowledge requirement—is not a harmless error with respect to conviction under the participation in a criminal gang statute.

**CRIMINAL LAW – HARMLESS ERROR DOCTRINE – EVIDENCE**

Evidence introduced solely for the purpose of proving the existence of a pattern of criminal gang activity—when admitted by the trial court in error due to the lack of evidence pertaining to the participation in a criminal gang statute's knowledge requirement—may be a harmless error with respect to convictions apart from participation in a criminal gang so long as the standard harmless error requirements are met.

**CRIMINAL LAW – CONFRONTATION OF WITNESSES – STANDARD OF REVIEW**

Criminal defendants are afforded the right to confront witnesses against them, but the right to cross-examine witnesses is not without limit as trial judges have the authority and sound discretion to limit the scope of cross-examination. Judges have wide latitude to establish reasonable limits on cross-examination based on concerns about, among other factors, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. Trial judges should balance a question's probative value against the danger of unfair prejudice.

**CRIMINAL LAW – CONFRONTATION OF WITNESSES – STANDARD OF REVIEW**

Appellate courts review the cross-examination limitations imposed by trial judges on an abuse of discretion standard.

**CRIMINAL LAW – APPEALABILITY – SCOPE OF ARGUMENT**

Counsel requesting to the trial judge to be permitted to question a witness as to whether the

defendant made a statement sufficiently makes apparent what counsel is trying to elicit and does not result in waiver of appeal.

## CRIMINAL LAW – CROSS-EXAMINATION – ABUSE OF DISCRETION

A trial judge's limitation of cross-examination due to her reasonable determination that the question was asked with the purpose of eliciting inadmissible testimony is not an abuse of discretion so long as the limitation complies with Maryland Rule 5-611(b).

## CRIMINAL LAW – ADMISSABILITY OF EVIDENCE – CONFUSION OF THE ISSUES

Excluded testimony that would have likely been relevant may nonetheless be excluded when the testimony would lead to a confusion of the issues.

## CRIMINAL LAW – APPEALABILITY – LIMITATION ON CROSS-EXAMINATION

Voluntary abandonment of a line of questioning upon receiving advice from the trial judge on how to proceed with questioning waives the right to appeal.

## CRIMINAL LAW – ADMISSABILITY OF EVIDENCE – CUMULATIVENESS AND WASTE OF TIME

Excluded testimony that would have likely been relevant may nonetheless be excluded when the testimony would be cumulative or a waste of time.

Circuit Court for Prince George's County
Case No. CT160618C

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 955

September Term, 2019

_____

FERNANDO BAIRES

v.

STATE OF MARYLAND

_____

Graeff,
Beachley,
Wells,

JJ.

_____

Opinion by Wells, J.

_____

Filed: January 28, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

The State alleged that appellant, Fernando Baires, shot two men on the parking lot of an apartment complex. One man died. As a result, the State charged Baires with first-degree murder, attempted first-degree murder, conspiracy to commit first-degree murder, use of a handgun in a crime of violence, and participation in a criminal gang. After a four-day trial, a jury sitting in the Circuit Court for Prince George's County convicted Baires of all counts. The court sentenced him to a combined term of life imprisonment plus 20 years. Baires filed a timely appeal and poses two questions, which we reproduce verbatim:

1. Did the trial court err by admitting the evidence of unrelated gang convictions?

2. Did the trial court err by limiting the cross-examination of State witnesses?

For the reasons that follow, we hold that the circuit court improperly admitted evidence of two murders committed by members of the criminal organization known as MS-13. While those convictions might have established a pattern of gang activity, they did not establish Baires' knowledge that he was participating with others in a criminal gang. We conclude that the impact of those convictions, however, was limited solely to Baires' participation in a criminal gang, and we therefore reverse only that conviction. Additionally, we perceive no error in the court's limitation on the cross-examination of the State's witnesses. Consequently, the remaining convictions are affirmed.

## FACTUAL BACKGROUND

### A. Events Surrounding the Shooting

On April 17, 2016, Gamaliel Nerio-Rico and Carlos Aguirre Tenorio were shot outside the Newbury Square Apartments on Riggs Road in Hyattsville. Gamaliel Nerio-Rico died of his wounds; Aguirre Tenorio survived.

After an investigation, the police charged appellant Fernando Baires, Manuel Alexander Beltran-Cazun, and Darwin Monroy-Madrid with a variety of crimes including first-degree murder. Baires was tried separately from his codefendants.

The Circuit Court for Prince George's County conducted a jury trial over four days: February 11-14, 2019. Among the eighteen witnesses who testified in the State's case-in-chief was Juan Alejandro Cedron who was the manager of the Newbury Square Apartments. He identified the location of the shooting as well as surveillance video that was taken of the scene at the time of the shooting.

Lea Flores lived with victim Aguirre Tenorio in an apartment at Newbury Square. She testified that she knew codefendants Beltran-Cazun and Monroy-Madrid and had seen them at the Newbury Square Apartments. On the night of the shooting, Flores was at the Galaxy Nightclub, just off Riggs Road in Hyattsville, with victims Aguirre Tenorio and Gamaliel Nerio-Rico. She testified that codefendants Beltran-Cazun and Monroy-Madrid were also at the club that night. However, Baires, who later testified, claimed he had never been to the Galaxy Nightclub.

Walter Cedillos Pineda was at the Galaxy Nightclub on the night of the shooting. He was with both victims at the time of the shooting. He could not identify Baires as one of the assailants, however. At the nightclub that night was Gamaliel Nerio-Rico's brother, Carlos Nerio-Rico. He testified that he did not see Baires there.

At the time of the shooting, Tyler Lemus, a resident of Newbury Square Apartments, was at home and heard shots just before 3:00 a.m. Lemus looked out of his window and saw a man lying in the street. Two other people were running and shooting. Lemus could

not identify Baires as one of the shooters.

After the shooting, the victims were taken to Prince George's County Hospital's emergency room. Dr. Anthony Shiflett, an emergency room physician who treated Aguirre Tenorio, testified that had he not provided treatment, Aguirre Tenorio would have died from the injuries he sustained during the shooting. Additionally, Dr. Sasha Breland of the Office of the Chief Medical Examiner, testified as an expert in the field of pathology. After reviewing and identifying Gamaliel Nerio-Rico's autopsy report, Dr. Breland opined that Nerio-Rico died as a result of gunshot wounds.

While the surviving victim, Aguirre Tenorio, was in the hospital, Detective Ruben Paz conducted a blind photographic array two days after the shooting with Aguirre Tenorio. In the course of viewing Paz's array, Aguirre Tenorio identified Baires as one of the shooters. Later at trial, Aguirre Tenorio, testified that Baires was one of the shooters.

**B. Baires' Interview with Detective Luis Cruz**

The State called Detective Luis Cruz as a witness. Cruz testified that he conducted witness interviews regarding the shooting. Based on the interviews conducted, according to Cruz, the detectives developed several suspects, initially identifying codefendants Beltran-Cazun and Monroy-Madrid as two suspects. As part of the witness interviews, Cruz interviewed Baires. On cross-examination of Cruz, the trial judge did not allow Baires' counsel to question how the detectives developed the suspects and whether Baires made statements to Cruz in the interview. The trial judge found that such an attempt involved questioning that was beyond the scope of what the State questioned Cruz about, ruling that counsel for Baires "can only cross[-examine] on what door is opened" by the

3

State on direct examination and that the State "didn't open that door."

## C. Testimony of Beltran-Cazun

The State also called codefendant Beltran-Cazun to testify. Beltran-Cazun testified to his familiarity of Monroy-Madrid and Aguirre Tenorio, the orders he received from another MS-13 gang member to kill Aguirre Tenorio that night, and his presence at the Galaxy Nightclub prior to the shooting. Beltran-Cazun further testified that after leaving the nightclub, he and another MS-13 member went to Newbury Square apartments and met with Monroy-Madrid and an individual whom he knew as "Stuart" (who Beltran-Cazun later testified that he believed to be Baires but "wasn't quite sure") to carry out MS-13 gang orders to kill a member of a rival criminal organization known as "the 18th Street gang." The trial judge limited the cross-examination of Baires' counsel by not allowing questions regarding the length of time that Beltran-Cazun was in the interview room with the police as well as potential punishments for MS-13 members. Baires' mother, Marybell Baires, later testified that to her knowledge Baires had never been referred to as "Stuart."

The prosecutor asked Beltran-Cazun to relate what he believed was his plea agreement with the State. The written plea agreement was admitted into evidence as State's Exhibit 36. On cross-examination, the trial judge did not allow counsel for Baires to ask whether "the State will only ask for 35 years total[,]" whether "the State will cap the request for sentence at 35 years," and whether his imprisonment would be "no more than 35" years.

## D. Retired Sergeant George Norris' Testimony

The State called former Prince George's County Police Sergeant George Norris to testify as an expert witness regarding MS-13. Norris helped implement Prince George's

4

County's gang unit in 2002 and worked as a sergeant in that unit until he retired in 2017. He traveled to El Salvador, where MS-13 has an especially large presence, as well as to other Latin American countries, to learn about gangs and has testified as an expert witness in more than 25 cases regarding MS-13. In this case, Norris testified as to the background, identifiers, and structure of MS-13 generally as well as its presence at the Galaxy Nightclub and in Prince George's County. Finally, Norris opined that the shootings at issue here occurred for the benefit of MS-13.

On cross-examination, counsel for Baires was permitted to ask Norris about his lack of familiarity with the shooting in this case. Baires' counsel also questioned Norris about whether he had ever met with Baires or with a member of Baires' family. Norris said that he did not know Baires or his family. The trial judge sustained State objections to Baires' counsel asking Norris if he knew anything about Baires' past or whether he knew if Baires had tattoos. Baires' mother, Marybell, and Baires himself later testified that he does not have tattoos.

### E. Gang Evidence

The State also called Prince George's County Detectives Michael Genung and Denise Shapiro to testify. Their comparatively brief testimonies consisted of describing homicides committed by MS-13 members against 18th Street gang members in Prince George's County.

Genung testified about a homicide that occurred on June 10, 2016. This homicide, like the homicide that Baires was charged with committing in April 2016, occurred in Hyattsville, Prince George's County, Maryland. The State questioned Genung regarding

5

MS-13 gang member Christian Alvares Beltran, who was convicted of the June 10, 2016 murder. Counsel for Baires made no objections to the testimony. However, after cross-examination, when the State moved to enter a copy of the certified conviction of Alvares Beltran, Baires' counsel objected based on relevancy. The trial judge allowed the evidence to be admitted.

Similarly, Shapiro testified about a homicide that occurred in Adelphi, Maryland in September 2016. Adelphi is near Hyattsville where the shooting took place, and both municipalities are in Prince George's County. The shooting that Shapiro testified to in Adelphi occurred on Riggs Road, the same road as the shooting at issue in this case. Shapiro testified that MS-13 gang member Hernan Sanchez Vasquez killed an 18th Street gang member in a gang-motivated shooting. Counsel for Baires made no objections during this testimony. Instead, at the conclusion of Shapiro's testimony, when the State moved to introduce a certified copy of Sanchez Vasquez's conviction, Baires' counsel noted a continuing objection, which the trial judge overruled.

### F. Verdict and Sentencing

On February 14, 2019, the jury found Baires guilty on all counts: first-degree murder, attempted first-degree murder, conspiracy to commit first-degree murder, use of a handgun in a crime of violence, and participation in a criminal gang. On June 28, 2019 the court sentenced Baires to life imprisonment for first-degree murder, and life imprisonment with all but twenty years suspended to be served consecutively for attempted first-degree murder. For conspiracy to commit first-degree murder, the court sentenced Baires to a period of life to be served concurrently with the first-degree murder count. Baires received

6

a sentence of 20 years with all but five years suspended for using a handgun in a crime of violence, to be served concurrently with the first-degree murder count. Finally, for the participation in a criminal gang count, the court sentenced Baires to 20 years with all but five years suspended.

**DISCUSSION**

## I. THE TRIAL COURT ERRED IN ADMITTING EVIDENCE OF UNRELATED GANG CONVICTIONS

### A. The Parties' Contentions

Baires insists that the circuit court erred in allowing Detectives Genung and Shapiro to testify to the jury about homicides that other members of MS-13 committed in June 2016 and September 2016. Baires claims that the evidence regarding these convictions had no connection to him nor to his case. In making this assertion, Baires argues that the testimonies of Genung and Shapiro are irrelevant under Maryland Rule 5-402 in that the testimonies do not make the allegations against him more probable or less probable than if this evidence had not been introduced.

The trial court admitted the evidence of the other homicides relying on Maryland Code Annotated, (2002, 2012 Repl. Vol.), Criminal Law ("CR") Article § 9-804 and its application in *Marshall v. State*, 213 Md. App. 532 (2013). Baires does not argue that CR § 9-804 and *Marshall* are inapplicable, but instead argues that the trial judge incorrectly interpreted *Marshall*. Specifically, Baires distinguishes his circumstances from those presented in *Marshall* by pointing out that there, the State proved CR § 9-804(a)(1)'s required element of "participat[ing] in a criminal gang knowing that the members of the

7

gang engage in a pattern of criminal gang activity" by illustrating that Marshall *individually* participated in other gang activities. Moreover, Baires asserts that the State introduced no evidence relating to his knowledge of gang activity that MS-13 members were engaged in, a required element of CR § 9-804(a)(1). In contrast, at Baires' trial, the State attempted to prove the element of a pattern of criminal gang activity by showing that other MS-13 murders—ones in which Baires is not accused of participating—had occurred in the same county where Baires allegedly committed his crimes for MS-13.

The State contends that CR § 9-804, which requires the establishment of a pattern of criminal gang activity, makes the testimonies of Shapiro and Genung relevant. According to the State, *Marshall* does not stand for the proposition that a pattern of gang activity must be proven through evidence involving the individual defendant. Rather, the State asserts that *Marshall* holds that a pattern of gang activity must be proven through evidence that the organization was involved in criminal gang activity, which may include evidence that does or does not concern the individual defendant so long as it concerns the gang. In essence, Baires believes that *Marshall* dictates that the only evidence that the State can use to prove that he participated in a criminal gang that was engaged in a pattern of gang activity is through evidence that has a direct connection between himself and the other incidents. In contrast, the State asserts that *Marshall* does not require that the evidence of the pattern of gang activity must involve the individual defendant.

The State also makes a twofold argument about waiver. At trial, Baires made no objection regarding Genung's testimony regarding the June 2016 killings until the State moved to enter a certified record of the conviction into evidence. And, with Shapiro's

8

testimony, Baires made no objection during the questioning of Shapiro but then made his "continuing objection" during the introduction of the certified conviction regarding the September 2016 killing. The State argues that Baires waived his objection under Maryland Rule 4-323(a) by not objecting at the time that the evidence was offered. The State also claims that even if Baires' objections relate only to the records of convictions and not to the oral testimony, any error in admitting the conviction records is harmless because the records of convictions contained information that had already been established without objection through the detectives' testimony. Baires counters that no waiver exists because the purpose of Genung's and Shapiro's testimony was not immediately apparent but once its purpose was realized, Baires' counsel immediately objected. Baires argues his objection was in close proximity to the detectives' testimony.

## B. Standard of Review

Relevant evidence is generally admissible. *Decker v. State*, 408 Md. 631, 648-49 (2009) (citations omitted). When a trial court makes a finding regarding relevance, appellate courts "are generally loath to reverse the trial court unless the evidence is plainly inadmissible under a specific rule or principle of law or there is a clear showing of abuse of discretion." *Id.* While trial judges have "wide discretion when weighing the relevancy of evidence[,]" judges do not have the discretion to admit irrelevant evidence. *State v. Simms*, 420 Md. 705, 724 (2011). With regards to the issues of relevancy, therefore, "[t]he determination of evidentiary relevance is a legal question that is reviewed *de novo*. *State v. Robertson*, 463 Md. 342, 353 (2019) (citing *Perry v. Asphalt & Concrete Services, Inc.*, 447 Md. 31, 48 (2016)). Because the trial judge's ruling here was on the relevancy, we

9

review the ruling under a *de novo* standard of review.

### C. Waiver Analysis

#### 1. Objections to Evidence under Maryland Rule 4-323

Taking first the issue of whether the appealability of the evidence regarding the unrelated homicides was waived, Rule 4-323(a) provides:

> (a) Objections to Evidence. An objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived. The grounds for the objection need not be stated unless the court, at the request of a party or on its own initiative, so directs. The court shall rule upon the objection promptly. When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court may admit the evidence subject to the introduction of additional evidence sufficient to support a finding of the fulfillment of the condition. The objection is waived unless, at some time before final argument in a jury trial or before the entry of judgment in a court trial, the objecting party moves to strike the evidence on the ground that the condition was not fulfilled.

Moreover, with respect to the method of making continuing objections, Rule 4-323(b) states:

> (b) Continuing Objections to Evidence. At the request of a party or on its own initiative, the court may grant a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope.

#### 2. Timing of the Objections

The State correctly asserts, and Baires does not dispute, that Rule 4-323(a) requires objections to be made "at the time the evidence is offered or as soon thereafter as the grounds for objections become apparent." The initial dispute here, however, is whether Baires' objection was timely. To be sure, Baires did not immediately object to the

prosecutor's questions nor to Officers Genung's and Shapiro's answers regarding the unrelated homicides. His objection came only when the State moved to admit a certified copy of the murder convictions into evidence at the conclusion of the direct examinations.

Rule 4-323(a) also imposes that the objections not made immediately must come "as soon thereafter as the grounds for objection become apparent. Upon the State's offer of evidence regarding the June 2016 shooting, the conversation immediately following Baires' objection between his counsel, counsel for the State, and the trial judge illustrates that the grounds for Baires' objection was not immediately apparent to his counsel:

> [COUNSEL FOR BAIRES]: Objection, Your Honor.
>
> THE COURT: You want to come up.
>
> (Counsel approach the bench)
>
> [COUNSEL FOR BAIRES]: I failed to see the relevance of that case that happened subsequent to the incident that we are here about. It does not involve the same parties. I'm not quite sure what the relevance is.
>
> [State counsel and the trial judge discuss the "pattern of criminal gang activity" element from Maryland Criminal Law § 9-804 and the holding of *Marshall v. State*, 213 Md. App. 532 (2013).]
>
> [COUNSEL FOR BAIRES]: I'm still kind of lost.

Following this discussion, Baires twice more noted his objection. Upon the State's admission of the copies of the unrelated certified convictions to prove Baires' gang participation, Baires' counsel made a continuing objection, which the trial judge noted and overruled.

We recognize that counsel cannot be clairvoyant. At the same time, we also think that counsel's confusion about why the prosecutor was asking the questions here should

11

have prompted an objection based on relevance. In any event, as to the timeliness of the objection, counsel objected "as soon thereafter as the grounds for objections become apparent," namely, when the State announced that the convictions were meant to prove Baires' participation in a criminal gang. Therefore, we conclude that under Rule 4-323(a) Baires did not waive or otherwise forfeit his right to appeal the admissibility of the testimony and the conviction records.

### 3. Duplicative Evidence

Most of the State's waiver argument claims that Baires waived his right to appeal as to the Genung and Shapiro testimonies because the testimonies are duplicative to the admitted conviction records. The State points us to *DeLeon v. State* and *Yates v. State* to prove that Baires' objection is waived. 407 Md. 16, 31 (2008); 439 Md. 112, 129 (2012). The State's argument here is essentially that because the testimony of Genung and Shapiro cover precisely the same information as the conviction records, Baires waived his appealability on the issue of the testimony. *See DeLeon v. State*, 407 Md. at 31 (citing *Peisner v. State*, 236 Md. 137, 145-46 (1964) ("Objections are waived if, at another point during the trial, evidence on the same point is admitted without objection.")).

The State's argument, however, necessarily depends on this Court concluding that Baires' objection to the testimony was not timely. As explained above, we hold that Baires timely objected. Thus, no situation exists here in which non-objected-to admitted evidence (the testimony) was "on the same point [as evidence] admitted without objection" (the conviction records). *See id.* Because the State's argument fails to meet the assumption on which it is based, we hold that Baires' objection is not waived due to duplicity.

12

**D. Admissibility of Unrelated Gang Convictions**

    1. Pattern of Criminal Gang Activity

CR § 9-804(a)[1] states:

> (a) A person may not:
>
> (1) participate in a criminal gang knowing that the members of the gang engage in a pattern of criminal gang activity; and
>
> (2) knowingly and willfully direct or participate in an underlying crime, or act by a juvenile that would be an underlying crime if committed by an adult, committed for the benefit of, at the direction of, or in association with a criminal gang.

A "pattern of criminal gang activity" is defined in CR § 9-801(e) as:

> (e) "Pattern of criminal gang activity" means the commission of, attempted commission of, conspiracy to commit, or solicitation of two or more underlying crimes or acts by a juvenile that would be an underlying crime if committed by an adult, provided the crimes or acts were not part of the same incident. [2]

As evidenced in CR § 9-804(a) above, an element of the crime that the State must prove is that the criminal organization members engaged in "a pattern of criminal gang activity." Baires argues that according to this Court's ruling in *Marshall*, the CR § 9-804

---

[1] As of October 1, 2020, a new version of CR § 9-804 went into effect. *See* CRIMINAL ORGANIZATIONS—PENALTIES AND PROCEDURE, 2020 Maryland Laws Ch. 422 (H.B. 1083). This version replaces the word "gang" with "criminal organization." This opinion references the previous version of CR 9-804 as that version was effective at the trial. However, the amendments between the previous and new version appear to make no difference as to the analysis of the issues of this case or the Court's precedents at issue here that examine CR § 9-804.

[2] Like CR § 9-804, CR § 9-801 has likewise been amended since trial. However, all amendments here occurred in subsection (g), which relates to underlying crimes. Subsection (e), relevant here, is unchanged. Thus, the recent amendments to CR § 9-801 do not impact this case.

pattern of gang activity element must be proven through evidence that links defendants individually to other gang activities. *See Marshall*, 213 Md. App. at 546-47 (CR § 9-804 "requires proving that [the defendant] engaged in a pattern of behavior with other individuals"). Further, Baires argues that the State had to prove that he knew that other members of MS-13 were engaged in the proffered gang-related activity.

Despite Baires' reliance on the above-quoted statement, it is important to recognize that *Marshall* was not decided on the basis of distinguishing whether evidence relating to "a pattern of criminal gang activity" involved the defendant individually or whether it involved separate gang members. *See id.* Rather, the relevant issue in *Marshall* was whether evidence of activities involving the defendant brought by the State could be used for § 9-804 purposes. *See id.* Baires fails to appreciate that *Marshall*'s language pertaining to satisfaction of the CR§ 9-804 pattern of criminal gang activity proof requirement via an individual defendant's activities was in relation to the context of the facts before the Court, in which the State there chose to prove the CR § 9-804 element through such individualized activities. By failing to take this into account, Baires requests that this Court extend *Marshall* in a way that would lead to a distortion of the statute.

In *Marshall*, the defendant argued that the evidence was unfairly prejudicial because the evidence specifically related to him, while here, Baires asserts that the evidence is irrelevant because it does *not* relate specifically to him. The facts in *Marshall* show that it was necessary for the State to use the defendant's own participation in a gang to prove the pattern of gang activity required by CR § 9-804. The particular gang at issue there was a small gang that Marshall started himself. *Id.* at 536. Marshall had previously been a part

14

of the Bloods, a street gang with members throughout the United States,[3] but left it in 2007 to form the small "Family Over Everything" gang, which was confined to the City of Baltimore.  *Id.* at 536-38.  In just the following year after starting his localized gang, Marshall was arrested for committing a kidnapping and murder of a Bloods gang member. *Id.*

In both size and the amount of time that the gang has had a presence in a locality, the "Family Over Everything" gang sharply contrasts with MS-13.  According to Norris, the State's expert witness on street gangs, MS-13 is a huge gang that started in Los Angeles decades ago, but has now spread across the globe, and has a presence in Prince George's County.  Given the difference in the size and scope of MS-13 with the Family Over Everything gang, it stands to reason that the CR § 9-804's pattern-of-gang-activity element may be satisfied through activities of other MS-13 gang members, rather than the activities of the individual defendant.  Additionally, the defendant in *Marshall* had been linked to other crimes involving the Family Over Everything gang, such as robbing a bar.  *Marshall*, 213 Md. App. at 547.  In *Marshall*, defendant engaged in other gang activities that the State knew about, apart from the kidnapping and murder for which he was being tried.

Here, there is no indication from the record or the parties that Baires had ever been tied to any crimes other than those from which he now appeals.  Baires would have us read into the statute, through our *Marshall* holding, that the only way that a pattern of criminal gang activity can be proven is when the other incidents of gang activity relate specifically

---

[3] The Encyclopedia Britannica: *The Bloods*. https://bit.ly/3cQEXuR.

to the individual defendant.  Adoption of such a reading, however, would be to add words to the statute that are not there.  Indeed, Baires' interpretation of CR § 9-804(a) would create situations where a defendant could plainly, in the precise words of the statute, "participate in a criminal gang knowing that members of the gang engage in a pattern of criminal gang activity[,]" yet still be non-prosecutable for the offense if it were the individual defendant's first instance of known individual participation.  *See id.*

Importantly, though, nothing in the language of CR § 9-804 requires the individual defendant to have engaged in a pattern of criminal gang activity.  All that is required is that the defendant have knowledge that "*members* of the gang" had engaged in the pattern of such activity.  CR § 9-804(a) (emphasis added).  We perceive nothing in CR § 9-804(a) which limits the prosecution to instances of participation where there is evidence that the defendant had already or subsequently personally participated in a pattern of gang activity.  Specifically, the statute only requires that "members" participate in criminal gang activity.  *Id.*  The statute makes no distinction whatsoever as to whether the "members" must or must not include the individual defendant.  The statute moreover provides no protections for individuals against prosecution simply because it cannot be proven that the individual has at separate times participated in gang activities.

*Marshall* was correctly decided and is applicable in analyzing CR § 9-804(a) issues.  Contrary to Baires' argument, however, *Marshall* does not limit the State to proof of only the individual defendant's activities to prove the necessary pattern of criminal gang activity.  Baires points to our statement that "we agree with the State that [CR § 9-804] requires proving that [the defendant] engaged in a pattern of behavior with other

16

individuals" to mean that in all contexts, such proof involving the defendant individually is the only way for the State to prove the element of the statute. *See Marshall*, 213 Md. App. at 546-47. However, such a reading fails to appreciate that this language from *Marshall* was in direct reference to the specific evidence that was before this Court and referred to that evidence in its appropriately narrow context. Indeed, the sentence immediately following the cited statement reads: "To the extent that such evidence [regarding the defendant's activities] may show a 'propensity for criminal behavior,' the statute clearly allows such evidence as an exception to the Rule, and in fact makes such evidence directly relevant to the offense." *Id.* As illustrated by this subsequent statement, we were discussing the CR § 9-804 requirement as it applied to that case. Our statement there in no way created a broad rule that limits the type of evidence that the State can admit to prove the pattern of criminal gang activity element from CR § 9-804 to evidence that relates only to activities of the individual defendant.

*In re Kevin T.*, 222 Md. App. 671 (2015), decided after *Marshall*, supports that we did not impose an interpretation like the one Baires proposes. There, we held that "[i]n order to prove a violation of CR § 9-804, the State [is] required to show that the MS-13 gang engaged in a pattern of criminal activity as defined in CR § 9-801(d)." *Id.* at 679. We went on to conclude:

> Our review of the record indicates that there was no evidence before the circuit court regarding "underlying crimes" that **MS-13** either committed, attempted to commit or had conspired to commit.
>
> Sergeant Norris, the State's MS-13 expert, never testified to specific crimes **attributable to MS-13.** The prosecutor appeared to be getting to that point, but stopped short of asking about specific criminal activity that would

17

have established **that MS-13 engaged in a pattern** of criminal gang activity[.]

*Id.* at 679 (emphasis added). Consequentially, *In re Kevin T.*'s holding illustrates that in proving a pattern of gang activities, the State is not bound to activities in which Baires personally participated. *Id.* Rather, the activities can be proven through the actions of any of the gang's members. *Id.*

2. Knowledge Element of CR § 9-804(a)

In addition to CR § 9-804 requiring the State to establish a pattern of criminal gang activity, the statute also requires that the State prove that the defendant possessed knowledge that the gang members engaged in such gang activity. CR § 9-804(a)(1) ("A person may not . . . participate in a criminal gang *knowing* that the members of the gang engage in a pattern of criminal gang activity[.]"). Accordingly, in order for Baires to be convicted of participation in a criminal gang, at trial, the State must introduce evidence showing that Baires had knowledge that MS-13 members were engaged in a pattern of criminal gang activity.

Baires argues that the State introduced no evidence whatsoever that relates to whether he had knowledge that MS-13 members engage in criminal gang activity. Specifically, Baires asserts that the introduction of evidence regarding the June and September 2016 shootings did not prove that Baires knew that members of MS-13 were engaged in a pattern of criminal gang activity. In making this argument, Baires distinguishes the facts here from those in *Marshall*. Baires notes that in *Marshall*, the State presented evidence that connected the defendant to gang activity because the defendant

18

himself committed the crimes while acting as the head of gang. But, Baires argues such a connection is absent here. For the State's part, it made no argument, at trial or on appeal, as to how the evidence of the unrelated convictions—or any other evidence introduced at trial—established Baires' knowledge that MS-13 members were engaged in a pattern of criminal gang activity. Although the State asserted at oral argument that Baires' argument regarding the lack of State evidence pertaining to his knowledge that MS-13 was engaged in a pattern of criminal gang activity was waived for not being asserted in Baires' brief, the State made no argument as to the merits of the claim at oral argument nor in its brief.

First, the State's assertion pertaining to Baires' alleged waiver of the argument cannot succeed. The State claimed at oral argument (1) that the argument was not preserved for appeal during trial and (2) that the argument was not raised in Baires' brief. However, as was more fully discussed in Part I, Section C, Subsection 4 of this opinion, counsel for Baires appropriately objected to the introduction of the June and September 2016 certified convictions based on relevancy. That relevancy objection preserved for appeal Baires' argument asserting that the introduction of the certified convictions is irrelevant for failure to establish the necessary knowledge requirement of CR § 9-804(a)(1).

Regarding the State's assertion made at oral argument that Baires failed to argue the knowledge element in his brief or reply brief, the Maryland Rules indeed require that an appellant's brief must include an "[a]rgument in support of the party's position on the issue." Md. Rule 8-504(a)(6). However, as illustrated on the thirteenth page of Baires' brief, Baires did, in fact, argue in his brief on appeal that the knowledge element from CR § 9-804(a)(1) was not met:

19

The glaring difference between [Baires'] case and the facts in *Marshall* is that the other criminal act introduced by the State in Marshall [(*sic*)] directly involved the defendant. In *Marshall*, the State introduced evidence of a robbery that took place after the incident in the case Marshall was charged with. The witness who testified indicated that Marshall was present during the robbery and was "together" with the other individuals in ordering the robbery. The Court [in *Marshall*] held that the evidence of his presence during the robbery "was relevant to the statutory requirement that Marshall 'knowingly and willfully direct [(sic)] or participate [(*sic*)] in the commission an [(*sic*)] underlying crime . . . committed at the direction of, or in association with a criminal gang.'" [*Marshall*, 213 Md. App.] at 547.

. . . .

In [Baires'] case, there was no such testimony or evidence connecting him to the unrelated crimes. [Baires] was not alleged to have been present at, a party to or have any knowledge of the crimes that the State introduced against him at trial. Without a connection between [Baires] and the introduced convictions, they do not satisfy the element that he participated in a criminal gang *knowing* that the members of the gang were engaged in a pattern of criminal gang activity. As such, the evidence was not relevant and the [c]ourt committed a reversible error by admitting it against [Baires].

In fairness to the State, the above-quoted language from Baires' brief appears to be the only part in either Baires' brief or his reply where the knowing requirement was addressed. Baires largely focused his argument on other issues in his brief yet made the knowing requirement more central during oral argument. Nonetheless, while "[a]rguments not presented in a brief or not presented with particularity will not be considered on appeal[,]" *Klauenburg v. State*, 355 Md. 528, 552 (1999), arguments that are "scant" or even "implicit" are properly preserved. *See Barnes v. State*, 437 Md. 375, 388 (2014) and *Grant v. State*, 414 Md. 483, 489 (2010). Here, Baires' argument regarding the knowledge element, though perhaps scant, is certainly more than implicit. Therefore, Baires'

20

argument in his brief meets the minimum requirement to be considered on appeal, contrary to the State's suggestion at oral argument.

Since we conclude that the issue is appropriate to consider on appeal, we next address the merits. The State made no argument at trial or on appeal as to how the knowledge requirement was met with respect to the certified convictions of the June and September 2016 killings. This Court has reviewed the transcript of the four-day trial to determine whether such knowledge might be inferred elsewhere. To be sure, a substantial amount of evidence exists that (1) codefendant Beltran-Cazun, self-admittedly, was a member of MS-13 and present at the shooting, (2) the shooting occurred on behalf of MS-13, (3) Baires was at the scene of the shooting, (4) Baires actively participated in the shooting, (5) MS-13 is a criminal gang with a presence in Prince George's County, and (6) members of MS-13 were engaged in a pattern of criminal gang activity.

Notably, however, there appears to be no evidence presented at any point during the four-day trial that suggests any knowledge that Baires might have possessed regarding a pattern of criminal gang activity. As discussed in detail in Part I Section D above, the State introduced evidence at trial of MS-13 shootings that occurred in June and September 2016 to satisfy CR § 9-804 and to prosecute Baires on his participation in a criminal gang charge. However, in explaining the purpose of this evidence, the State repeatedly referred only to the pattern of criminal gang activity element and never to the knowledge element. For example, in arguing at trial that Baires' counsel's objection to the introduction of the certified conviction involving the June 2016 shooting should be overruled, the State asserted that "the relevance is that as part of being charged with violation of gang

participation statute [(*sic*)], *the State has to prove that there was a pattern of criminal gang activity*. One of the underlying events to establish that is murder." No mention of Baires' knowledge was made by the State. The immediately ensuing exchange between the counsel for Baires and the trial judge reveals that the trial judge similarly appears to have overlooked the knowledge requirement:

> THE COURT: [T]here is an element in [the participation in a gang] statute that says it has to be proven by the State that there is similar gang activity. And that's what they have to prove. It's an element.
>
> [COUNSEL FOR BAIRES]: That there is criminal gang activity in Prince George's County?
>
> THE COURT: Yes, sir. That's what they have to prove.
>
> [COUNSEL FOR BAIRES]: And one case that happened after the incident.
>
> THE COURT: Just that they have to prove gang activity occurring in Prince George's County.
>
> [COUNSEL FOR BAIRES]: My objection.

While the trial judge and the State are correct that a pattern of gang activity must be proven, the plain language of CR § 9-804(a)(1) also requires that in addition to the pattern of gang activity element, knowledge of members engaging in gang activity must also be proven.

Similarly, in the State's closing argument, the State again discussed the introduction of Genung and Shapiro's testimonies and the related certified convictions regarding June and September 2016 shootings as it relates to the CR § 9-804(a)(1) pattern of gang activity element:

> Detective Mike Genung and Detective Denise Shapiro come in for a very specific purpose . . . [T]hey were here because they have done MS[-]13

22

investigations specifically involving homicides and those homicides specifically involved MS[-]13 going after 18th Street members and killing them. You have the certified convictions.

. . . .

> *So the reason that Detectives Genung and Shapiro came in and talked about their case is because you have to see that there is a pattern of violence*, through MS[-]13 engages in a pattern of criminal violence [(*sic*)]. You have the two convictions in evidence for murders. And it was as a result of the ongoing war with 18th Street. And you have the certified conviction for retaliating against a witness. *There is clearly a pattern*.

Again, absent here is any mention of the knowledge requirement of CR § 9-804(a)(1) that would link the June and September 2016 shootings to something to which Baires would possess knowledge.

In its argument before this Court in its brief, the State continued to only reference the pattern of criminal gang activity element and never the knowledge element of CR § 9-804(a)(1). The State argued:

> Evidence of criminal gang activity is an element of participation in a criminal gang [statute], for which Baires was on trial.

. . . .

> The testimony of Detective Genung and Sergeant Shapiro established the *pattern of behavior* of members of MS-13 killing members of the 18th Street gang. It was therefore relevant, and admissible.

Again, no mention of Baires' knowledge as it relates to the June and September 2016 shootings or any other evidence was made anywhere in the State's brief.

The jury is charged with finding whether Baires knew that MS-13 was engaged in a pattern of criminal gang activity. As part of proving the pattern, the State introduced evidence that MS-13 was indeed engaged in a pattern of criminal gang activity in Prince

23

George's County. Because the existence of such a pattern is necessary to prove that Baires knew of the pattern, and because Baires' knowledge of this pattern is an element that must be decided by the jury, CR § 9-804 makes evidence relating to the pattern of activity relevant evidence, despite the fact that it involves activities separate from which Baires is being tried. Whether such outside evidence involves Baires individually or not is immaterial under CR § 9-804, so long as it establishes that any members of the gang—Baires or not—were engaged in a pattern of criminal gang activity.

Still yet, beyond merely proving the pattern, the State must also prove that Baires possessed knowledge of the pattern in which MS-13 members are engaged. At trial and on appeal, this Court is unable to find anywhere that the State links the June and September 2016 shootings, which established the pattern, to Baires' knowledge of the pattern when he allegedly committed his shooting. Indeed, the June and September 2016 shootings occurred after the shooting for which Baires was tried and did not involve him. Therefore, while this evidence can, under *Marshall*, be used to establish a pattern, we cannot find any justification that would allow this evidence to establish Baires' knowledge of that pattern.

Because neither the State's evidence of the June and September 2016 shootings, which was introduced to prove CR § 9-804, nor any other evidence by the State in any way supported the CR § 9-804's knowledge requirement, the trial court erred in admitting the evidence of the June and September 2016 shootings. Although that evidence could be used to support the existence of a pattern a criminal gang activity if there was some indication Baires had knowledge of the pattern, the complete lack of evidence that would suggest that Baires had knowledge of that pattern—required under CR § 9-804—causes the certified

24

convictions of the June and September 2016 shootings to be inadmissible. We conclude

that the trial court erred by admitting the evidence under CR § 9-804.

### 3. Harmless Error

Finally, we must consider whether the trial court's error in introducing evidence of

the June and September 2016 shootings resulted in prejudice against Baires or whether the

error was harmless. Specifically, we must analyze whether the error was harmless with

respect to Baires' participation in a criminal gang conviction, the charge to which the State

claimed it had the purpose of introducing the inadmissible evidence. Moreover, we must

similarly analyze whether the error resulted in prejudice or was harmless with respect to

Baires' other charges.

In criminal appeals, we apply a "beyond a reasonable doubt" standard when

determining whether an error is harmless:

> [W]hen an appellant, in a criminal case, establishes error, unless a
> reviewing court, upon its own independent review of the record, is able to
> declare a belief, beyond a reasonable doubt, that the error in no way
> influenced the verdict, such error cannot be deemed 'harmless' and a reversal
> is mandated. Such reviewing court must thus be satisfied that there is no
> reasonable possibility that the evidence complained of—whether
> erroneously admitted or excluded—may have contributed to the rendition of
> the guilty verdict.

*Dorsey v. State*, 276 Md. 638, 659 (1976).

We first address the issue of whether the admission of the June and September 2016

shootings was a harmless error. This evidence, in the form of Genung and Shapiro's

testimony as well as the certified convictions, was admitted by the trial judge for the

express purpose of satisfying CR § 9-804. Indeed, in the colloquy between the attorneys

25

and the trial judge upon Baires' counsel's objection to admission of the evidence and after the State revealed that the evidence was "being offered to show[,] to satisfy the element of the criminal gang statute[,] it's admissible[,]" the trial judge agreed with the State that "there is an element in that statute [(CR § 9-804)] that says it has to be proven by the State that there is similar gang activity. And that's what they have to prove. It's an element."

With regards solely to Baires' participation in a criminal gang charge, we cannot conclude that the admission was harmless. As we previously discussed, the certified convictions of the June and September 2016 shootings were admitted for the specific purpose of satisfying CR § 9-804. Although the jury relied on these certified convictions to convict Baires under CR § 9-804, it was error to do so because the State did not prove that the other convictions satisfied the statute's knowledge requirement. Significantly, the State introduced no other evidence that spoke to Baires' participation in a criminal gang charge. Without satisfaction of the necessary knowledge element but with the introduction of these June and September 2016 shootings, Baires was necessarily prejudiced as he was ultimately convicted for participation in a criminal gang based solely on inadmissible evidence. As we see it, there was no other evidence from which the jury could possibly have drawn an inference that Baires knowingly participated in a criminal gang. We conclude that the admission of the other convictions adversely affected the verdict and was not harmless beyond a reasonable doubt. *See Dorsey v. State*, 276 Md. at 659. Consequently, Baires' conviction on the gang participation charge is reversed.

Next, we analyze whether the evidence was harmless with respect to the other crimes that Baires was convicted of apart from his participation in a criminal gang.

26

Namely, these convictions consist of first-degree murder, attempted first-degree murder, conspiracy to commit first-degree murder, and use of a handgun in a crime of violence. Here, unlike in our analysis regarding the participation in a criminal gang conviction, we determine that the trial court's error in admitting the evidence relating to the June and September 2016 shootings was harmless. Perhaps most importantly, there is significant evidence, apart from the evidence admitted in error, that the jury was able to consider in making its determination that Baires indeed committed these specific crimes.

For example, video surveillance footage from Newbury Square Apartments, the complex where the shooting took place, helps put Baires at the scene of the crime. In the footage, Baires was identified by multiple witnesses as the individual wearing a gray sweatshirt. This individual is seen in one of the videos struggling to run, falling seemingly from exhaustion, and apparently coughing. This is significant as the defense describes Baires as suffering from severe asthma. Moreover, the videotape footage presented to the jury depicted the events immediately prior to and immediately after the shooting from multiple angles from a number of different cameras, which would assist the jury in determining whether the shooter from the video was or was not Baires. This evidence, described in greater detail below, illustrates to us that the error of admitting evidence of unrelated shootings was harmless beyond a reasonable doubt for all of Baires' convictions aside from participation in a criminal gang.

First, the surviving victim, Carlos Aguirre Tenorio, described in detail the events leading up to the shooting in April 2016. He then told the jury that he came face to face with the man who shot him, Baires:

27

[STATE:] And as you kept walking towards the building, what happened?

[AGUIRRE TENORIO:] I saw the first [shooter] who came out to me. He came out of the -- from the dark and he shot me.

[STATE:] You said the first one that you saw was by the light post?

[AGUIRRE TENORIO:] Yeah.

[STATE:] The person that you are describing that shot you, where was he?

[AGUIRRE TENORIO:] Above, almost right by the wall of the building, standing on the yard.

[STATE:] That's the one who shot you first?

[AGUIRRE TENORIO:] Yes.

[STATE:] What happened next after he shot you first?

[AGUIRRE TENORIO:] I took off running. I felt the first shot, not the rest of them. When I was in the middle of the road, I felt that my body was running but it wasn't. I stopped in front of the two of them and I felt that they put a gun to my chest. When they shot me, I got out of there and I took off running but not much, walking, kind of walking. That's when I felt a shot to my head and that's when I fell to the ground.

In the hospital, after the shooting, Aguirre Tenorio identified Baires as one of his shooters when police presented him with a photograph of Baires. Moreover, even prior to the video footage being played, Aguirre Tenorio made an in-court identification of Baires and then viewed portions of the video footage. Given the (1) face-to-face contact that Aguirre Tenorio made with the shooter, both before and while being shot, (2) Aguirre Tenorio's identification of Baires as the shooter the day after the shooting, and (3) Aguirre Tenorio's in-court identification, we find that this evidence is sufficient to make any error of the trial

28

court admitting evidence of the June and September 2016 shootings—which did not speak to the specific events of this particular shooting—harmless beyond a reasonable doubt.

Second, although we rely on it to a lesser extent in determining whether the evidence was harmless, we do give some weight to co-defendant Beltran-Cazun's testimony. Aside from bolstering the video surveillance evidence, Beltran-Cazun through his testimony (1) placed Baires at a dumpster near the scene of the shooting just prior to the crime, (2) placed Baires, whom he sometimes referred to as "Stuart," at the scene of the crime, (3) revealed that Baires had a firearm while at the scene of the crime, (4) confirmed that Baires was wearing a gray sweatshirt at the scene of the crime, and (5) stated that Baires fled the scene and then met up with him and Monroy Madrid. Beltran-Cazun admitted that he participated in the murder/shooting and testified that he committed those crimes with Baires at his side. Certainly, the jury had the ability to find his testimony credible. Regardless of whether this evidence alone would be sufficient to conclude that the error is harmless beyond a reasonable doubt, we conclude that this evidence combined with the video surveillance footage—which is in and of itself sufficient absent Beltran-Cazun's testimony but is nonetheless bolstered by Beltran-Cazun's testimony—clearly satisfies the threshold of making the admission of the June and September 2016 shootings harmless beyond a reasonable doubt.

Third, the video footage shows a man wearing a gray sweatshirt, whom co-defendant Beltran-Cazun and victim Carlos Aguirre Tenorio testified was in fact Baires, struggling to run as he flees from the scene. As he runs, this individual is the slowest of the four perpetrators, always behind the other three, as seen in each of the various cameras

29

set up at different points throughout the apartment complex's parking area.  In one camera view, the man in the gray sweatshirt can be viewed struggling so much that he slows and actually falls to the ground.  Then, appearing to cough, he stands back up and continues running.  These events are consistent with the defense's own assertions that Baires struggles with asthma.  Baires' mother, Marybell, testified that Baires suffers from extreme asthma:

> [COUNSEL FOR BAIRES:]  Did there come a time when Fernando stopped going to school?
>
> [MARYBELL BAIRES:]  Sometimes he would miss school because he was born with asthma.  He suffers from asthma.
>
> [COUNSEL FOR BAIRES:]  But he did stop going to High Point [High School] at some point, correct?
>
> [MARYBELL BAIRES:]  He stopped going for a while always because of the asthma.
>
> [COUNSEL FOR BAIRES:]  Now you mentioned asthma, what kind of affect did it have on Fernando?
>
> [MARYBELL BAIRES:]  He was born with that condition and since he was young he spent more time in the hospital than he did at home.
>
> . . . .
>
> [COUNSEL FOR BAIRES:]  What further effect did the asthma have on him?
>
> [MARYBELL BAIRES:]  When he came to this country he always had asthma and that's why he suffered from asthma and missed school a lot.

On cross examination, Marybell briefly reiterated her son's struggles with asthma:

> [STATE:]  Let's go back to  April of 2016, was Fernando attending High Point High School, in April of 2016?

[MARYBELL BAIRES:] No, he was not. It's not that he wanted to miss school, he would miss school for two days and then when he would recover he would go back to school.

Baires' asthma provided further evidence for the jury that he was in fact the individual wearing the gray sweatshirt, as identified by the surviving victim and co-defendant. This evidence additionally proves that any error admitting evidence of the June and September 2016 shootings is harmless beyond a reasonable doubt.

In conclusion, our review of the record shows the prejudicial effect of the introduction of the June and September 2016 killings was confined to the conviction for participation in a criminal gang. The evidence against Baires came not only from his co-defendant but also from the surviving victim and videotape footage of the crime captured from surveillance cameras located in multiple locations. The videotape evidence showed Baires dressed differently from the other shooters and wearing a gray sweatshirt, which was also testified to by co-defendant Beltran-Cazun and the victim, Carlos Aguirre Tenorio. Different cameras showed the "before and after" as the co-defendants gather near a dumpster, wait for the victims in the apartment complex's parking lot, shoot them, and then run away after the shooting took place. Baires, who suffers from asthma by the defense's own admission, struggles to run and falls to the ground while coughing.

In coming to our determination that the trial court's error was harmless with respect to Baires' convictions apart from his participation in a criminal gang conviction, we note that this conclusion is based on our understanding that the erroneously admitted evidence is plainly "unimportant in relation to everything else the jury considered in reaching its verdict." *Dionas v. State*, 436 Md. 97, 118 (2013). We do not arrive to our conclusion by

31

simply examining whether the evidence admitted without error would, in the absence of the erroneously admitted evidence, be sufficient for a jury to convict Baires of the crimes. *See id.* As we have discussed, a plethora of evidence relates strictly to Baires' charges that were separate from his participation in a criminal gang charge, while the erroneously admitted evidence relates solely to his participation in a criminal gang charge.

Additionally, we consider that Baires was not implicated in either of the crimes the prosecutor introduced to show Baires' gang affiliation. For that reason, they were harmless as it related to the question whether he committed the murder and other non-gang related crimes here. Therefore, it is clear to us that the erroneously admitted evidence is entirely "unimportant in relation to everything else the jury considered in reaching its verdict" for his convictions with exception of his participation in a criminal gang conviction. *Id.*

Accordingly, for these reasons, while we find error, we reverse only Baires' conviction under CR § 9-804 for participation in a criminal gang and vacate that sentence. This decision does not reverse any of the other crimes for which the jury convicted Baires.

## II. THE TRIAL COURT DID NOT ERR IN LIMITING BAIRES' CROSS-EXAMINATION OF THE STATE'S WITNESSES

### A. The Parties' Contentions

Baires argues that the trial judge erred by limiting his cross-examination of three of the State's witnesses: Prince George's County Police Detective Luis Cruz, codefendant Alex Beltran-Cazun, and former Prince George's County Police Sergeant George Norris. Specifically with Cruz, Baires asserts that his cross-examination was within the scope of the State's direct examination regarding his questioning as to (1) where Baires was held

for the interview, (2) the amount of time that the interviews lasted, and (3) how Cruz developed suspects. With his cross-examination of Beltran-Cazun, Baires claims that the trial judge erred by not allowing him to ask specific questions regarding the maximum length of imprisonment of Beltran-Cazun's plea agreement. Finally, Baires asserts the trial court's limitation on his cross-examination of Norris was in error when he questioned whether Norris had reviewed Baires' past and whether Norris had any knowledge as to whether Baires had tattoos. Baires claims that these limitations prevented him from presenting a defense and confronting his accusers.

The State asserts waiver with respect to Cruz's testimony, arguing that Baires' counsel failed to enter into the record what particular portion of a statement was admissible. In the absence of waiver, the State maintains that the trial judge acted within her discretion by finding that Baires' attempted questions went beyond the scope of Cruz's testimony on direct examination. The State asserts that the trial judge's limitation on cross-examination of Beltran-Cazun was not an abuse of discretion as it prevented undue delay and confusion of the issues. Lastly, regarding Norris, the State again raises waiver, alleging that Baires failed to proffer what Norris's answers might have been and for abandoning his line of questioning. The State also contends that regardless of any waiver, Baires' questions were properly limited for being cumulative or a waste of time.

**B. Standard of Review**

Central to the right of criminal defendants to confront witnesses against them from the Sixth Amendment's Confrontation Clause and Article 21 of the Maryland Declaration of Rights is the opportunity to cross-examine witnesses. *Pantazes v. State*, 376 Md. 661,

33

680 (2003) (citation omitted). Still, the right to cross-examine witnesses is not without limit as trial judges have the authority and the sound discretion to limit the scope of cross-examination. *Smallwood v. State*, 320 Md. 300, 307 (1990). Specifically, "[t]he Confrontation Clause does not prevent a trial judge from imposing limits on cross-examination. Judges have wide latitude to establish reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Pantazes*, 376 Md. at 680 (citations omitted).

When exercising their discretion, trial judges should balance a question's probative value against the danger of unfair prejudice. *Id.* "On appellate review, we determine whether the trial judge-imposed limitations upon cross-examination that inhibited the ability of the defendant to receive a fair trial." *See Pantazes*, 376 Md. at 681-82 (internal quotations and citations omitted). Therefore, we review the cross-examination limitations imposed on Baires by the trial judge on an abuse of discretion standard.

### C. Cruz Testimony

#### 1. Appealability

The State claims that Baires waived his argument regarding the limitations the trial judge placed on his cross-examination of Cruz by not making clear what he was trying to elicit regarding his questioning. However, counsel for Baires specifically argued that his questioning was within the scope of direct examination and pointed to Cruz testifying on direct examination about his interview with Baires. In the exchange between counsel for Baires and the trial judge, Baires' counsel specifically asked the trial judge whether he

could "at least question as to whether [Baires] made a statement[,]" to which the trial judge unambiguously responded "[n]o. I am not going into any statements. No. No. No . . . I can't."

Just prior to the above exchange, upon the trial judge sustaining the State's objection to Baires' question of where Baires was held during the interview, the trial judge explained that the question was outside the scope of direct examination. Baires asserted that he was simply trying to ask whether or not he made statements to Cruz, which he argues that he should have been able to ask because of Cruz's testimony that he interviewed Baires.

Based on the above explanations given by Baires' counsel as to why he believed the testimony that he attempted to elicit from Cruz was admissible, we cannot say that "[i]t is not at all apparent from the record what defense counsel was intending to elicit," as the State asserts. Therefore, we conclude that Baires did not waive his argument on appeal as to the trial judge's limitation on cross-examination of Cruz.

2. Merits

Maryland Rule 5-611(b) provides trial judges with the role of limiting cross-examination "to the subject matter of the direct examination and matters affecting the credibility of the witness." Md. Rule 5-611(b). Indeed, the trial judge was particularly concerned that the questions asked to Cruz by Baires' counsel during cross-examination exceeded the scope of what was asked on direct examination by the State: "That's way beyond the scope of direct . . . You are not getting into the interview, what he said . . . [The State] didn't open that door, simply on that reason, I'm not allowing [the question]." With

35

respect to the witness, the trial judge moreover noted that Cruz "didn't testify as to anything [Baires] said[,]" before again remarking that the State "didn't open that door."

Baires frames the purpose of the questions, both at trial and now on appeal, as simply related to the time, length, and method of Cruz's interviews. However, as the above statements by the trial judge make clear, the trial judge plainly believed that those questions—although perhaps having the appearance of being related simply to the time, length, and method of the investigations—were made either to elicit information that was beyond the scope of direct examination or would have resulted in testimony that was in fact beyond the scope of direct examination. Indeed, the determination of whether to limit cross examination is left to the sound discretion of the trial judge. *Smallwood v. State*, 320 Md. at 307. The trial judge is plainly in the best position to determine whether such cross-examination questioning will result in testimony that will exceed the scope of direct examination. We will not disturb a trial court's discretionary decision "except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons." *Jarrett v. State*, 220 Md. App. 571, 584 (2014) (quoting *Bazzle v. State*, 426 Md. 541, 549 (2012)).

Here, we cannot conclude that Baires met his burden to illustrate that the trial court's decision was an abuse of discretion. The trial judge was in the best position to determine whether the questioning on cross-examination would have resulted in testimony that would have exceeded the scope of direct examination. The trial judge made a reasonable determination that the proposed questions were made for the purposes of exceeding direct examination or would have in fact resulted in responses that would have exceeded the

36

scope of direct examination. Under Rule 5-611(b), the trial judge here was therefore obligated to ensure that "cross-examination [was] limited to the subject matter of the direct examination and matters affecting credibility of the witness" by limiting the questioning of Baires' counsel. *See* Md. Rule 5-611(b). In imposing the limitations, the trial judge complied with Rule 5-611(b) and did not abuse her discretion. As such, we find no reversible error with the trial judge's limitation on Baires' cross-examination of Cruz.

### D. Beltran-Cazun Testimony

Maryland Rule 5-616 allows for the questioning of witnesses on cross-examination to prove that a witness is biased or has a motive to testify falsely:

> (a) Impeachment by Inquiry of the Witness. The credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at:
>
> . . . .
>
> (4) Proving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely[.]

Md. Rule 5-616(a). According to this rule, "[w]hat is admissible . . . in the case of a witness testifying for the State in a criminal case, is whether the witness expects some benefit with respect to pending charges as a result of testimony on behalf of the prosecution." *Peterson v. State*, 444 Md. 105, 135 (2015). Specifically, "[i]t is the *answer* to such a question that is admissible when the question is permissible under Maryland Rule 5-616(a)(4), which allows a cross-examiner to ask questions 'proving that the witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify fals[ely].'" *Id.* (emphasis in original) (citing *Calloway v. State*, 414 Md. 616, 637-39 (2010)). Still,

37

evidence such as this that is relevant may nonetheless be excluded if the trial judge reasonably determines that the evidence will result in confusion of the issues and undue delay. Md. Rule 5-403 ("[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence").

The State does not contend here that testimony regarding a 35-year maximum sentence of imprisonment from Beltran-Cazun's plea agreement would be irrelevant under Rule 5-616(a)(4). Rather, the State concedes the relevancy on this issue but argues that the trial judge nonetheless appropriately limited Baires' cross-examination according to Rule 5-403, specifically on the bases that the relevant evidence would result in confusion of the issues and undue delay.

Here, Baires was attempting to prove that Beltran-Cazun had a motive to lie under Rule 5-616(a)(4). In doing so, Baires' counsel attempted three times to ask Beltran-Cazun whether his plea deal was subjected to a maximum of 35 years imprisonment:

> [COUNSEL FOR BAIRES]: Now, furthermore, according to this agreement the State will only ask for 35 years in total; is that correct?
>
> [STATE]: Objection.
>
> THE COURT: Sustained.
>
> [COUNSEL FOR BAIRES]: Now, according to this agreement, the State will cap the request for sentence at 35 years; is that correct?
>
> [STATE]: Objection.
>
> THE COURT: Sustained.

38

. . . .

       [COUNSEL FOR BAIRES]:  So when you testified that there were no promises made, that was not true, correct?

       [BELTRAN-CAZUN]:  Well, they never promised me that it would be 35 years.  They said it could be 35 years.

       [COUNSEL FOR BAIRES]:  But no more than 35?

       [STATE]:  Objection.

       THE COURT:  Sustained.

Clearly, Baires' questioning as to the length of imprisonment per the terms of Beltran-Cazun's plea deal was an attempt to prove that Beltran-Cazun had a motive to lie.  Such a motive to lie is relevant evidence according to Rule 5-616(a)(4).

Although it is not apparent to us how the questioning would have resulted in undue delay, as the State asserts, we nonetheless hold that the trial judge acted within her role to limit cross-examination of Beltran-Cazun to avoid confusion of the issues.  State's exhibit 36, Beltran-Cazun's plea agreement, shows that the agreement was not as straightforward as Baires' counsel repeatedly alluded to in his cross-examination.  Rather than promising a straightforward 35-year sentence, the plea agreement detailed multiple sentences of imprisonment, including life sentences, that when tallied, amounted to 35 years:

> The parties agree that the sentence for Count 1 – First Degree Murder will be life suspend all but a cap of 35 years active incarceration.  The sentence for Count 2 – Attempted First Degree Murder will be life suspend all but a cap of 35 years active incarceration.  The sentence for Count 5 – Use of a Handgun in the Commission of a Felony and a Crime of Violence will be 20 years.  The sentence for Count 7 – Gang Association/Participation will be 20 years.  The sentence for Count 9 – Conspiracy to Commit Murder will be life suspend all but a cap of 35 years active incarceration.  The sentence

39

in Count 2 will run concurrent to Count 1; the sentence in Count 9 will run concurrent to the sentences in Counts 1 and 2; the sentence in Count 5 will run concurrent to the sentences in Counts 1, 2 and 9, the sentence in Count 7 will run concurrent to the sentences in Counts 1, 2, 9 and 5. The State does not oppose a referral to the Patuxent Youthful Offenders' Program. Upon his release, the Defendant will be placed on 5 years of supervised probation.

Significantly, "[w]hen assessing the possibility of prejudice or confusion [of the issues], 'the trial court is entitled to consider whether the witness's self-interest can be established by other items of evidence.'" *Peterson v. State*, 444 Md. at 136 (internal quotation and citation omitted). Despite Baires' counsel's questioning, evidence in the form of the actual plea agreement between Beltran-Cazun and the State had already been admitted for the jury's consideration. The testimony that Baires attempted to elicit—that Beltran-Cazun had a motive to lie by reaching a plea agreement with the State that will result in him serving 35 years in prison for testifying against Baires—was duplicated through the actual plea agreement which was introduced into evidence and considered by the jury. Indeed, at the very end of Baires' closing argument, his counsel argued to the jury that Beltran-Cazun was biased and had a motive to testify falsely:

> Credibility of witnesses whether the witness has a motive not to tell the truth. Let's go back to Manuel Beltran-Cazun. The State asked a question and the answer was, there were no promises. Come on, really. Really, no promises. Come on. There is an agreement, no promises. An agreement usually means, I promise to do this and you promise to do this. Don't try to identify it as anything less that young man was facing three life sentences plus [40 years]. How much is he going to get, 35 years. No promises. Come on. Does he have a reason to fabricate? Yeah.

> . . . .

> You will see the instructions. The witness [Beltran-Cazun] has pleaded guilty—the guilty plea of this witness must not be considered against the Defendant.

40

Although the testimony that Baires attempted to elicit would have likely been relevant, because the expected testimony had already been established through other evidence, we conclude that the trial court did not err and did not abuse its discretion in limiting cross-examination of Beltran-Cazun. The "constitutionally required threshold level of inquiry" was not violated by the trial judge's limitation. *See Smallwood*, 320 Md. at 307 (quoting *Brown v. State*, 74 Md. App. 414, 419 (1988)). Through the introduced plea agreement, the jury was fully aware of any potential bias or motive to testify falsely. Indeed, counsel for Baires was able to argue, based on the introduced plea agreement, that such a bias or motive to testify falsely existed, and the jury was fully able to make such a determination. Therefore, we decline to disturb the trial judge's ruling on this issue. Still, even if we were to conclude that the trial judge's determination was an abuse of discretion, the error would have been harmless beyond a reasonable doubt given the introduction of the plea agreement.

### E. Norris Testimony

#### 1. Appealability

With respect to the State's argument that Baires waived his right to appeal any error in the limitation on cross-examining Norris regarding Baires' background, we find no merit in the State's contention that Baires waived his argument according to Maryland Rule 4-323. While it is unclear to us as to what particular section of Rule 4-323 the State refers to in its argument that "Baires did not proffer to the trial court what the answer to his questions might have *been*" and thus that "this argument is, arguably, waived[,]" we assume that the

41

State refers to Subsection C, which reads in full:

> (c) Objections to Other Rulings or Orders. For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court. The grounds for the objection need not be stated unless these rules expressly provide otherwise or the court so directs. If a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection at that time does not constitute a waiver of the objection.

Md. Rule 4-323(c). We find nothing in this rule cited by the State that supports the State's contention that the Rule would require Baires to "proffer to the trial court what the answer to his questions might have *been*," and we decline to read any such requirement into the Rule.

We find merit, however, in the State's argument that Baires waived his right to appeal the trial judge's limitation on his cross-examination of Norris about whether Norris knew if Baires had any tattoos. In this argument, the State asserts that Baires' argument on appeal is waived due to him voluntarily abandoning his line of questioning. Indeed, we find the discussion between the trial judge and Baires' counsel analogous to the discussion between a trial judge and counsel in the Court of Appeals decision in *Grandison v. State*, 305 Md. 685 (1986).

In *Grandison v. State*, the following colloquy took place between the trial judge and counsel for the defendant:

> [COUNSEL FOR THE DEFENDANT]: I am surprised you didn't object before, [counsel for the State].
>
> THE COURT: I am too. A lot of this hasn't been in the evidence anywhere.

[COUNSEL FOR THE DEFENDANT]: I believe that every case that I have ever read with this type of thing said there is extreme latitude in a death case, and I would be permitted to go far beyond the evidence.

THE COURT: Extreme latitude. There is an end to all latitudes[.]

[COUNSEL FOR THE DEFENDANT]: Is the Court ruling me out of order on this particular point?

THE COURT: No, sir, I am just saying, your obligation to your profession, try to hold it within the limits. That is all.

[COUNSEL FOR THE DEFENDANT]: I realize my obligation to my profession, Your Honor.

THE COURT: I say, keeping that in mind, hold this down within those limits.

[COUNSEL FOR THE DEFENDANT]: I am not quite certain I know the nature of [the State]'s objection.

[STATE]: I would be glad to state the nature of my objection. The statement was not true.

THE COURT: Gentlemen, I don't think you are doing anybody any good by going into this. I think we all understand what the problem is.

[COUNSEL FOR THE DEFENDANT]: I am not certain I do, but I will drop that particular subject for the moment.

*Id.* 305 Md. at 763-64. Important to note from this colloquy, the trial judge declined to rule that defense counsel could not continue questioning on his particular point, but instead provided advice on how the counsel could proceed without being overruled. *Id.* Although the defense counsel said that he would "drop that particular subject for the moment[,]" in reality he never returned to the topic. The Court of Appeals held that such an abandonment operated as waiver of the issue:

43

It is clear from the above exchange that the defense voluntarily abandoned this line of argument. Throughout the remainder of [the defendant]'s closing argument, it was never again mentioned. The right of appeal may be waived where there is acquiescence in the decision from which the appeal is taken or by otherwise taking a position inconsistent with the right to appeal. By dropping the subject and never again raising it, [the defendant] waived his right to appellate review of this issue.

*Id.* 305 Md. at 765 (citations omitted).

Here, an analogous exchange between counsel for Baires and the trial judge leads us to conclude that Baires waived the right to appeal by abandoning his line of questions. Like in *Grandison*, the trial judge did not rule that Baires was entirely prevented from questioning Norris about a particular topic—whether Baires had tattoos—but instead advised Baires' counsel as to the appropriate way in which he could do so:

> [COUNSEL FOR BAIRES]: Sir, to your knowledge, does Mr. Baires have a tattoo?
>
> THE COURT: Come on up.
>
> (Counsel approach the bench.)
>
> THE COURT: Are you going to – he said he never talked to him before.
>
> [COUNSEL FOR BAIRES]: Well, I asked, to his knowledge, does he have a tattoo.
>
> THE COURT: He can't answer that. He never talked to your client. The only way he would know about it would be through someone else.
>
> [COUNSEL FOR BAIRES]: Well, the thing about it, as an expert, he reviewed information.
>
> THE COURT: None of that information included talking to your client, that's the problem. And for that information --

44

[COUNSEL FOR BAIRES]: So I can't even ask the question, to his knowledge, whether he knows?

THE COURT: No.

[COUNSEL FOR BAIRES]: Because he said he spoke to law enforcement persons as part of review of the file.

THE COURT: So you are saying that you believe that you should be able to ask if any of the law enforcement officials told him whether or not your client had a tattoo. You can ask him that.

[COUNSEL FOR BAIRES]: I'm sorry.

THE COURT: You can ask him that. Did any of them tell him about your client --

[COUNSEL FOR BAIRES]: -- having a tattoo.

THE COURT: Or not having a tattoo. See that's the problem and then you are getting into evidence indicia of what they might have said during their discussion, which I don't think you really want to do. Because he never talked to your client, so it had to have be[en] from law enforcement. But if you want to get into that issue[,] think about that.

[COUNSEL FOR BAIRES]: Okay.

Upon returning to cross-examination of Norris, Baires' counsel declined to question Norris on tattoos in the manner the trial judge advised and made no more mention of tattoos throughout the rest of the cross-examination. Therefore, we conclude Baires abandoned his questioning of the topic just as the defendant in *Grandison* abandoned the questioning there. *See Grandison v. State*, 305 Md. at 763-64.

Given that Baires voluntarily abandoned his line of argument, we must here likewise conclude that Baires waived his right to appeal by dropping the topic of tattoos and never raising it again. We hold that Baires' argument that the trial judge improperly limited his

45

cross-examination on the topic of Norris's knowledge of whether Baires had tattoos is nonreviewable.

2. Merits

Baires contends Norris' expected testimony would have been relevant because, Baires' claims of Norris' lack of familiarity with Baires generally and, specifically, whether Baires had tattoos. Although we have held that Baires has waived any error the court may have made limiting counsel's questions on tattoos, we nonetheless consider the merits of that claim. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised . . . but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.") The State does not contend that Norris's testimony would have been irrelevant. Instead, the State argues the trial judge's limitation on the cross-examination was proper because it precluded questions that were cumulative or a waste of time.

As previously noted, Rule 5-403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of . . . waste of time[] or needless presentation of cumulative evidence." With respect to Baires' attempt to prove a lack of connection between MS-13 and himself, counsel for Baires had already asked Norris numerous questions regarding his level of familiarity with Baires. Specifically, Norris testified that while he had not met with Baires nor with Baires' family, he had "reviewed the original documentation" of the shooting, "which include[d] basically what happened in the . . . incident report [and] statement of charges to get the gist of how

46

[the shooting] happened" and that he "also talked to officers involved in the investigation who asked [him] questions as well as [talked to the] prosecutors." After eliciting this testimony, Baires' counsel continued the line of questioning by asking whether Norris had "reviewed anything about his past[,]" which the trial judge did not allow Norris to answer.

While Norris's answer to Baires' counsel's question might have been relevant, it also risked being cumulative or otherwise a waste of time. Norris's anticipated answer would have added nothing to Baires' argument regarding Norris's unfamiliarity to Baires. The answers would have simply illustrated that Norris was unfamiliar with Baires' past and that Norris did not know if Baires had a tattoo. This information was already before the jury. Norris had testified that he knew nothing about Baires except for what he had learned through "original documentation" of the shooting and conversations with prosecutors and police officers. Baires' counsel's questions would have elicited repetitive information. This Court has previously held that the asking of "repetitive questions that [would] solicit[] cumulative evidence and needlessly prolong[] testimony" is inadmissible according to Rule 5-403. *Holmes v. State*, 236 Md. App. 636, 675, *cert. denied*, 460 Md. 15 (2018). We find no abuse of discretion in this regard.

**THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS AFFIRMED IN PART AND REVERSED IN PART. APPELLANT'S CONVICTION FOR PARTICIPATION IN A CRIMINAL GANG IS REVERSED AND THE SENTENCE FOR THAT OFFENSE IS VACATED. ALL OTHER CONVICTIONS AND SENTENCES ARE AFFIRMED. COSTS TO BE EVENLY DIVIDED.**