*Malik Mungo v. State of Maryland*, No. 1658, September Term, 2021.   Opinion by Graeff, J.

**CRIMINAL VENUE — WAIVER OF MANDATORY MOTION — CRIMINAL ORGANIZATION STATUTE — PARTICIPATION IN A CRIMINAL ORGANIZATION THAT RESULTS IN DEATH — PLAIN ERROR REVIEW**

A claim of improper venue is waived if it is not timely filed unless the court finds good cause to excuse the late filing.  In this case, defense counsel did not give any reason for failing to file a timely motion, and counsel did not suggest there was good cause until oral argument in this Court.  Appellant has waived his improper venue argument.

Pursuant to Md. Code Ann., Crim. Law Art. ("CR") § 9-804(a) (2021 Repl. Vol.), it is unlawful for an individual to (1) "participate in a criminal organization knowing that the members of the criminal organization engage in a pattern of organized crime activity," and (2) "knowingly and willfully direct or participate in an underlying crime . . . committed for the *benefit of, at the direction of, or in association with* a criminal organization." (Emphasis added).  Pursuant to CR § 9-804(e): "A person may not violate subsection (a) of this section that results in the death of a victim."  To sustain a conviction under CR § 9-804(e), participation in a criminal organization that results in death, the State must prove four elements.  First, an individual participated in a criminal organization knowing that the members engage in a pattern of organized criminal activity.  Second, the individual knowingly and willfully directed or participated in an underlying crime.  Third, the crime was committed "for the benefit of, at the direction of, or in association with" a criminal organization.  Fourth, the crime resulted in the death of the victim.

A crime is committed "in association with" a criminal organization if it is committed either with other gang members or with "the apparatus of the gang."  A weapon used to commit a crime constitutes an apparatus.  If a crime is committed with a weapon supplied by a criminal organization, that fact supports a jury finding that the crime was committed "in association with" a criminal organization.  The use of a gang provided firearm to commit the crime here, as well as the assistance of the gang after the shooting, was sufficient evidence to support the jury's conviction on this charge.

We decline to exercise our discretion to review for plain error appellant's claim that the court erred in asking a voir dire question that he requested.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 1658

September Term, 2021

_____

MALIK MUNGO

v.

STATE OF MARYLAND

_____

Graeff,
Albright,
Raker, Irma S.
        (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed: July 25, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

This case involves the shooting of Sebastian Dvorak on June 13, 2017, in Baltimore City, as well as other gang associated activity. The police ultimately linked the murder to a neighborhood gang called "500." On August 20, 2018, a grand jury indicted Malik Mungo, appellant, on multiple charges, including participation in a criminal organization that resulted in death.[1]

After appellant's first trial, which began on May 29, 2019, a jury in the Circuit Court for Baltimore County convicted appellant of multiple drug and gun charges.[2] The jury was unable to reach a verdict on the other charges, including the murder and robbery of Mr. Dvorak and the gang charges. The court declared a mistrial on those charges.

After appellant's second trial, which began on October 6, 2021, a jury convicted appellant of first-degree felony murder, robbery, knowingly participating in a criminal organization, conspiring to participate in a criminal organization, and knowingly participating in a criminal organization that resulted in death. It found appellant not guilty of robbery with a dangerous weapon and use of a handgun during the commission of a

---

[1] The statute appellant was charged under was subsequently amended by the Maryland General Assembly during the 2020 legislative session, which made technical changes to the statute not relevant to the issues on appeal. *See* 2020 Md. Laws ch. 422 (effective Oct. 1, 2020). The amendment replaced the word "gang" with "criminal organization," but otherwise, the statute was essentially unchanged. *See Baires v. State*, 249 Md. App. 62, 77 n.1 (2021). We shall refer to the current language of the statute in this opinion. *See* Md. Code Ann., Crim. Law Art. ("CR") § 9-804 (2021 Repl. Vol.).

[2] Of the 19 charged offenses, the jury found appellant guilty of conspiring to distribute controlled dangerous substances, three counts of prohibited possession of a regulated firearm and ammunition, and three counts related to distribution and possession of a substance falsely represented to be MDMA (also known as "Molly" or "ecstasy"). It found appellant not guilty of three counts of burglary.

crime of violence.  The court sentenced appellant to life imprisonment, all but 45 years suspended, on the conviction for first-degree felony murder, and five years, consecutive, on the conviction for participating in a criminal organization that resulted in death. The conviction for robbery merged with the conviction for first-degree felony murder, and the convictions for knowingly participating in a criminal organization and conspiracy to participate in a criminal organization merged with the conviction for participation in a criminal organization that resulted in death.

On appeal, appellant presents the following questions for this Court's review, which we have rephrased slightly, as follows:

1.     Did the circuit court commit reversible error when it denied appellant's request to dismiss the charges related to the robbery and murder of Mr. Dvorak for improper venue?

2.     Did the circuit court commit reversible error when it denied appellant's motion for judgment of acquittal on the charge of participation in a criminal organization that resulted in death?

3.     Did the circuit court commit plain error when it asked a compound strong feelings question during voir dire?

For the reasons set forth below, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

Khalyll Hicks, appellant's friend and co-defendant, testified that, on June 13, 2017, appellant said that he was "gonna hit a lick," which meant commit a robbery. At approximately 2:40 a.m., appellant saw Mr. Dvorak, who was on his way home from a night out with friends.  An altercation ensued, and appellant shot Mr. Dvorak.  Appellant and Mr. Hicks then fled the scene.

2

Mr. Dvorak was found unresponsive in the roadway near the 2500 block of Boston Street in Baltimore City. He suffered from a gunshot wound to the torso and had several lacerations and contusions to the face and abdomen. He was transported to Johns Hopkins Bayview Medical Center, where he later died from his injuries.

On August 20, 2018, after several months of covert investigation between the Baltimore City Police Department and the FBI, appellant was charged in the Circuit Court for Baltimore County with multiple counts, including conspiracy, drug distribution, participation in a criminal organization that resulted in death, and murder. The State charged multiple people in connection with crimes committed by the "500" gang, including appellant, Clinton Davis, Joseph Flowers, Duwarn Holt, Robert Lewis, Vernon Miller, Dante Neal, Gregory Randle, Harvey Turner, Keith Worthington, Lienell Young, Markeece Jordan, and Timothy Zeller. Mr. Hicks was charged for crimes related to the robbery and murder of Mr. Dvorak, but not for crimes related to the gang.[3] He pleaded guilty to two handgun charges and second-degree murder of Mr. Dvorak.

Police linked appellant to a gang called "500," also known as "500 L," which operated on the 500 block of North Rose Street in Baltimore City.[4] The gang was formed in 2014, and its primary objective was to sell drugs and make money. The gang often sold drugs such as fentanyl, heroin, cocaine, marijuana, and MDMA (also known as "Molly" or "ecstasy"). Members of the gang would flash the letter "L" or display a "5" to signify their

---

[3] Mr. Hicks was not a member of "500."

[4] The "L" stands for love or loyalty.

3

membership in the gang. Although "500" is commonly referred to as a neighborhood gang, leaders of the gang are affiliated with the Bloods. Mr. Lewis, Mr. Randle, Mr. Turner, and Mr. Worthington are the leaders of "500."

Trial began on May 29, 2019. After a 16-day trial, the jury found appellant guilty on several drug and firearm charges, but it was unable to come to a verdict on the robbery and murder charges, or the gang charges. The court declared a mistrial on these charges and ordered a new trial.

A second trial began on October 6, 2021. The charges before the jury were first-degree felony murder, second-degree murder, robbery with a dangerous weapon, robbery, using a handgun during the commission of a crime of violence, knowingly participating in a criminal organization, conspiring to participate in a criminal organization, and knowingly participating in a criminal organization that resulted in death. Thirty-three witnesses testified for the State, including multiple co-defendants, detectives, and experts. For purposes of this appeal, we set forth only the underlying facts and testimony necessary to address the issues brought on appeal.

In opening statement, the State presented three main points with respect to the crime of participation in a criminal organization that resulted in death. First, it asserted that the gang had a hierarchy structure, where members of a lower rank could move up in the ranks if they put in the work. Second, there was a traceable path that the firearm used by appellant took through the gang. Third, members of the gang assisted appellant in covering up the murder and avoiding getting caught to protect their own interests and the interests of the gang.

Mr. Zeller, a co-defendant who testified pursuant to a plea agreement he entered in exchange for a mitigated sentence, stated that, in February 2017, he moved near the 500 block of North Rose Street, where he met Mr. Lewis. Mr. Lewis was in a wheelchair and needed assistance traveling from the assisted living facility where he lived to the place where he sold drugs. Mr. Zeller had lost his job, and he agreed to drive Mr. Lewis as a way to make money. Mr. Lewis introduced Mr. Zeller to appellant, a member of "500" who sold drugs for the gang. The gang would use Mr. Zeller's house to store drugs and guns because of its location on the block.

On April 17, 2017, Mr. Zeller's wife, Crystal Defreitas, traveled to South Carolina and purchased several handguns, including a gray Kel-Tec .38 caliber firearm with the serial number JND23. Mr. Zeller sold the Kel-Tec .38 to Mr. Lewis a few weeks prior to the June 13, 2017 shooting.

A few days after the shooting, Mr. Zeller overheard a conversation between appellant, Mr. Lewis, and other members of "500," who advised that appellant had been seen running from the crime scene on multiple cameras, and he needed to change his appearance. Mr. Lewis was angry because the murder was committed with the gray Kel-Tec .38 he purchased from Mr. Zeller. Mr. Zeller recorded Mr. Lewis telling someone on the phone that this firearm was "gone never to be found."

Mr. Miller, a co-defendant who pleaded guilty in exchange for a mitigated sentence, testified that he and appellant were members of "500." His primary role was to hold drugs and guns for the gang. He kept a communal gun in his house that the gang called "Big Bitch." This was a Kel-Tec 9 millimeter semi-automatic gun given to him by Mr. Randle.

5

Members of the gang, including appellant, would use this gun when needed or when Mr. Randle instructed them to do so.

Several detectives, including Detective Shivdayal Bawa, Detective Ivan Bell, Detective Cedric Booth, Detective Stephon White, and Detective Gregory Price, testified that they conducted surveillance and made undercover purchases from the members of "500" between the months of August 2017 and March 2018. During this time, the police made several controlled purchases of drugs and firearms from the gang. Many of these purchases were captured on audio and video recording, which were admitted into evidence.

Detective Price testified that he was the co-affiant on several different wiretaps and search warrants in connection with the "500" investigation. He testified as an expert in "how drugs are packaged and distributed on the street," and "how groups work together to distribute drugs." During the course of the undercover investigation, he received information that the individual responsible for the June 13, 2017 shooting sold drugs in the area of North Rose Street and Jefferson Street.

On September 12, 2017, after a member of the undercover team purchased drugs from appellant, Detective Price conducted a field interview. Appellant identified himself and stated that he lived in the 400 block of North Luzerne Avenue.

In December 2017, Detective Price received wiretap authorizations for the cell phones of Mr. Worthington, Mr. Turner, Mr. Randle, and Mr. Holt. Appellant occasionally was intercepted on this wiretap but not very often because he did not have a steady phone. On one such interception between appellant and Mr. Holt, appellant indicated that he worked for Mr. Holt selling drugs. During a call between appellant and Mr. Randle, Mr.

6

Randle said that he needed more consistency from appellant, which Detective Price testified meant that Mr. Randle wanted appellant on a more permanent basis and "not just temporary." Detective Price also obtained search warrants for appellant's and other co-defendants' social media accounts, the contents of which were admitted as evidence.[5]

On April 20, 2018, Detective Price participated in the execution of warrants in both Baltimore City and Baltimore County. Various drugs, firearms, ammunition, and drug distribution evidence were recovered in each jurisdiction. The gang's communal firearm also was recovered from Mr. Miller's house in Baltimore City during the execution of these warrants.

On July 18, 2018, Detective Price executed another search warrant on Mr. Davis' house in Baltimore County after receiving information from Mr. Randle that the weapon used in the murder of Mr. Dvorak was at this location. A gray Kel-Tec .38 registered to Ms. Defriedas with a serial number of JND23 was found in a dresser drawer in the second-floor bedroom.

Detective Price concluded that, based on his investigation, "500" was a group of people who worked together to sell drugs and protect the 500 block of North Rose Street. There was a hierarchal structure within the group, where the lower-level members would sell drugs and return the money to the higher-level members. Appellant was among the lower-level members.

---

[5] Several of the social media posts depict appellant and other members of the gang flashing the "500" gang hand signs.

On-cross examination, Detective Price testified that the undercover investigation was not about gangs; it was about finding "the person who was responsible for the shooting, as well as the individuals he was working with." They focused on this group because of the information that the person responsible sold drugs in this location. Mr. Hicks was not a member of the gang, and no one else from the gang was involved in the actual shooting. Members of the gang helped cover up the murder afterwards by getting rid of the gun and advising appellant to change his appearance to avoid detection by law enforcement. They did this "[b]ecause they didn't want attention being brought back to the group or the area."

Mr. Young, a co-defendant who pleaded guilty and testified in exchange for a mitigated sentence, testified that he and appellant were both members of "500." Appellant was the youngest member of the gang, and leaders would give the drugs to lower members to sell on the streets. Appellant was the "upcoming guy," and everyone liked him.

Matthew Drechsler, Mr. Dvorak's friend, testified that he and a few friends were together celebrating Mr. Dvorak's birthday on the night of the murder. Mr. Dvorak had a Nintendo Switch with him, as well as his wallet and cell phone, which had died earlier in the night. Mari Jo Paterniti, Mr. Dvorak's girlfriend, testified that she was also with him on the night of the murder, and Mr. Dvorak had only $7 and his bank card in his wallet.

Dennis Tinker testified that, during the early morning hours of June 13, 2017, he heard a gunshot outside. When he went outside, he saw Mr. Dvorak lying in the middle of the roadway. Danny Loudermik, Jr., a delivery driver who also saw Mr. Dvorak lying in the road, called 911.

8

Officers William Berardi and Andre Hibler, members of the Baltimore City Police Department, responded to Boston Street for a call regarding an injured person at approximately 2:45 a.m. Officer Berardi, the first officer on the scene, called for paramedics and secured the scene. Neither officer recovered a wallet, cell phone, or Nintendo Switch from Mr. Dvorak. Both officers had body-worn cameras, and recordings from that morning were played for the jury.

Dr. John Stash, a member of the Office of Chief Medical Examiner, testified as an expert in forensic pathology that a bullet was recovered from Mr. Dvorak's lower back during the autopsy. He opined that Mr. Dvorak's cause of death was a gunshot wound to the torso, and the manner of death was homicide.

Detective Lee Brandt, Jr., recovered surveillance footage from different areas around Boston Street on the morning of the shooting. He compiled the raw footage into one streaming video, which was admitted into evidence. The video initially showed two suspects, but only one towards the end. The police suspected the two split up, and the other suspect was in an area with no cameras.

Daniel Lamont, a forensic scientist in the Baltimore City Police Department Firearms Lab, examined the bullet recovered from Mr. Dvorak's autopsy. He examined the Kel-Tec .38 alleged to have been used in the shooting and performed a comparison between a test bullet fired from the Kel-Tec, and the bullet recovered from Mr. Dvorak's autopsy. The test came back inconclusive, and he was not "able to identify the autopsy bullet to the bullet from that test-fired gun, but [he] was also not able to exclude it as having come from that gun."

9

Special Agent Mathew Wilde, a member of the FBI Cellular Analysis Survey Team ("CAST"), used a phone number for appellant to show mapping details for his and Mr. Dvorak's cell phones. On June 12, 2017, at 11:26 p.m., appellant's phone was pinging a tower just north of Patterson Park. No other activity was reported from appellant's phone until 9:42 a.m. on June 13, 2017, where it pinged a tower in the area of North Rose Street. Mr. Dvorak's phone reported using a tower in the area of Canton Square between 8:00 p.m. and 10:58 p.m. The phone did not ping again until 1:00 p.m. on June 13, 2017, almost eleven hours after the shooting, when it pinged a tower located on the intersection of North Luzerne Avenue and Jefferson Street.[6] The phone remained active in this area until 9:47 p.m.

Mr. Hicks testified pursuant to a plea agreement in which he pleaded guilty to the murder of Mr. Dvorak. On June 12, 2017, Mr. Hicks and his brother went to the 500 block of North Rose Street and met with appellant. Mr. Hicks purchased some cannabis from appellant, they hung out, and appellant showed Mr. Hicks a small handgun he had in his waistband. Later that evening, appellant told Mr. Hicks that he wanted to steal a car for his birthday and go for a joyride. The three men began "free-roaming," i.e., looking for vehicles left unlocked. Appellant gave Mr. Hicks the gun because it was too heavy, and his pants were falling down. They eventually ended up in the Canton area of Baltimore City. Mr. Hicks' brother went home, and after the other two were unsuccessful in finding a car, Mr. Hicks returned the gun to appellant.

---

[6] This intersection is located near the 500 block of North Rose Street where the gang sold drugs.

Appellant told Mr. Hicks that he was tired of looking for a car to steal, so he was "gonna hit a lick," meaning commit a robbery. Appellant then saw Mr. Dvorak holding an electronic device. The two men ran up to him, with appellant taking the lead. Mr. Dvorak attempted to fight off the robbery, and appellant took out the gun, pointed it at Mr. Dvorak, and said: "Kick that shit out," meaning give me all your possessions. Appellant then hit Mr. Dvorak in the face with the gun. Mr. Dvorak said that he did not have anything, and appellant said: "If you don't kick it out, I'm gonna shoot you." Mr. Hicks patted down Mr. Dvorak and found his wallet, which was empty, so he tossed it. Appellant then fired one shot at Mr. Dvorak. Mr. Hicks and appellant then fled and eventually split up. Mr. Hicks saw appellant a week or two after the shooting, and they had a "heated conversation," during which appellant asked if Mr. Hicks had told anyone what happened.

Sergeant Joseph Landsman, a member of the Baltimore City Police Department Anti-Crime Section, testified as an expert in gangs. He reviewed the files relating to the "500" investigation, including witness statements, surveillance videos, social media records, photographs, cell phone downloads, and wiretap calls. On March 15, 2018, Sergeant Landsman interviewed Mr. Lewis. He then immediately intercepted a call between Mr. Lewis and Mr. Randle discussing the interview and how the police questioned Mr. Lewis about the gun used in the murder.

Sergeant Landsman testified that, in his expert opinion, "500" was a neighborhood gang led by Mr. Lewis and Mr. Randle. The gang's territory included the 400 and 500 blocks of North Rose Street. In his opinion, appellant was a member of the gang. He explained that appellant

11

operated during the drug distribution for the gang in the territory of the gang, reported and took instructions from the leaders of the gang, as well as shared the stash houses, had the gun that was provided by the gang members, reported daily to the members and took instructions on how he was gonna operate.

The gang had constant communication among members on issues related to "bringing in proceeds," how and when the drug sales were going to take place, "where a firearm was, whether or not police were in the area, were there buyers in the area, [and] whether or not there was a threat that was suspected in the area." Members of the gang would pool their money to help other members get out of jail. Sergeant Landsman also testified to a social media post made by Mr. Randle, where he exposed a cooperating witness and stated, "a rat is a rat."

Sergeant Landsman testified that communal guns were used by the gang for "protection, intimidation, and to commit crimes." If a higher-ranking gang member gives a lower ranking member a gun, he conveys authorization to use it to commit crimes, with the expectation that it will be returned. He opined that, if a member of the gang used a gang gun to commit a robbery, "[i]tems taken in that robbery are gonna come back to the benefit and furtherance of the gang for the gang to make use of and proceed from, and that gun is gonna come back to the gang." If a gang gun was used in a crime, members of the gang would act to get rid of the gun because it could "bring attention to the gang's territory" and "lead law enforcement to that area where they operate." If a member of the gang was involved in a crime, the gang would "come up with a plan on how to avoid that person being identified any further." This would not be done for someone who was not a member of the gang.

12

Sergeant Landsman opined that the murder of Mr. Dvorak was gang-related because appellant: (1) got access to the firearm through the gang; (2) took items back to the gang's territory; (3) returned the firearm to the members of the gang; and (4) sought advice on how to avoid police detection. All of these acts were things that would not have been done unless appellant was a member of the gang. Sergeant Landsman stated that none of Mr. Dvorak's items were ever recovered, but the phone was in gang territory after the shooting. He testified that the murder was gang-related because the gun "was supplied to the member of the gang, and the individual went out and used it during a robbery that resulted in a murder."

Mr. Randle, one of the leaders of "500," pleaded guilty in exchange for his testimony and a lower sentence. He testified that he started the "500" gang in 2014, with the goal to make money selling drugs. They brought people in, including appellant, to package and sell the drugs.

Mr. Randle and Mr. Lewis both had personal guns, and Mr. Lewis would give his gun to whomever was left outside when he left the area. Mr. Randle stated that giving someone a personal gun did not authorize them to use it, but "[w]hat they do with it, they do with it."

Mr. Randle and other members of the gang saw a video on social media regarding the shooting and observed appellant "walking away trying to put his glasses on, ducking and stuff." Shortly after the shooting, appellant approached Mr. Randle and told him that a guy had been following him, so he shot him. Appellant later told him that "he was looking to rob somebody, and the guy bucked on him, and he shot him." Leaders of "500" met

13

with appellant and said that he needed "to do something. Like, stop wearing the same stuff, stop wearing them glasses, cut your hair." Everyone was offering advice because they were all "invested in him," and they were trying to cover themselves because he used one of their guns.

Mr. Randle testified that, after high-ranking members of "500" discussed the incident, Mr. Lewis told Mr. Randle that he wanted to get the gun back from appellant because "[i]t was his," and "he wanted to get rid of it" because it was "hot," i.e., it was used in the murder. Mr. Lewis and Mr. Davis traded firearms in a gun-swap. When asked about the call intercepted by Sergeant Landsman between him and Mr. Lewis, Mr. Randle confirmed that they were talking about the Kel-Tec .38 that Mr. Lewis bought from Mr. Zeller, which was used in the murder.

At the conclusion of the State's case, appellant's counsel asked the court to grant a motion for judgment of acquittal on the charge of first-degree murder, arguing that the murder took place in Baltimore City, and Baltimore County did not have jurisdiction to prosecute the homicide charge via the criminal organization statute. He argued that there was no connection between the gang activity and the murder, asserting that "[t]he mere incident that allegedly the gun that was used to shoot Mr. Dvorak came from a gang, and the gun is then subsequently returned to the gang is not any gang contact which allows that charge to be enveloped within . . . the [criminal organization] statute." The court denied the motion. The defense rested its case without calling any witnesses or producing any evidence. Counsel then renewed his motion for judgment of acquittal, which was denied.

At the conclusion of the evidence in the second trial, the jury found appellant guilty of first-degree felony murder, robbery, knowingly participating in a criminal organization, conspiring to participate in a criminal organization, and knowingly participating in a criminal organization that resulted in death. He was found not guilty of robbery with a dangerous weapon and using a handgun during the commission of a crime of violence.

Appellant filed a motion for a new trial, arguing, among other things, that there was no evidence that appellant participated in a criminal organization that resulted in death. He asserted that there was insufficient evidence supporting this verdict because there was no nexus between the shooting and the gang. He argued that the only evidence that might create a nexus was the handgun, "which was not evidenced as the murder weapon," by any forensics or ballistics evidence.

The State argued that the evidence was sufficient to convict on this charge. With respect to the requirement that the shooting was done "for the benefit of, at the direction of, or in association with" the gang, this was shown by the following evidence:

- Appellant was a member of the gang who worked for and sold drugs for the benefit of the gang;

- Gang leaders frequently communicated with him and directed "his daily drug-dealing for the gang";

- He used the gang's communal firearm and returned it at the direction of and on behalf of one of the gang leaders;

- Mr. Lewis, a gang leader, sometimes would instruct appellant to take his gun home with him;

- Mr. Lewis gave appellant the Kel-Tec .38 prior to the murder and robbery of Mr. Dvorak on the condition that it would be returned;

15

- Appellant and Mr. Hicks robbed and killed Mr. Dvorak on June 13, 2017, using the same Kel-Tec firearm provided by the gang;

- Following the shooting, appellant returned to the gang for refuge and advice on concealing his identity, and they "counseled and directed [him] to change his appearance, lay low, cut his hair, and get rid of his glasses";

- Appellant returned the Kel-Tec .38 to Mr. Lewis after the murder;

- Mr. Dvorak's stolen phone began sending cell tower pings from a location inside the gang's territory where appellant's phone also was located just two hours before the murder;

- Mr. Lewis was motivated to get rid of the Kel-Tec .38 to protect appellant and the gang following the shooting;

- Mr. Lewis disposed of the Kel-Tec .38 for the benefit of appellant in a gun swap with Mr. Davis, a known associate of the gang; and

- "[T]he weapon found in [Mr.] Davis' [dresser] drawer on July 18, 2018, was the same weapon that had been used in the robbery and murder of [Mr.] Dvorak."

The court denied the motion.

This appeal followed.

## DISCUSSION

## I.

## Improper Venue

Appellant contends that the circuit court erred in denying his request to dismiss counts six through thirteen of the indictment.[7] He asserts that Baltimore County was not

---

[7] Counts six through thirteen charged the following offenses: (6) first-degree murder; (7) second-degree murder; (8) robbery with a dangerous weapon; (9) use of a handgun in the commission of a crime of violence; (10) illegal possession of a regulated firearm; (11) possessing a regulated firearm, while being under 21; (12) illegal possession

16

the proper venue for these counts, which pertained to the robbery and the murder of Mr. Dvorak in Baltimore City.

The State contends that appellant waived the issue of venue by failing to file a timely motion pursuant to Maryland Rule 4-252(b). It asserts that, pursuant to this rule, a motion raising improper venue must be filed within 30 days of the earlier of the appearance of counsel or the first appearance of the defendant before the court, which appellant did not do. In any event, the State argues that the court properly denied the motion arguing improper venue, asserting that Md. Code Ann., Crim. Law Art. ("CR") § 9-807 (2021 Repl. Vol.) provides that "venue may lie in multiple counties." It contends that the General Assembly, by "providing for multiple methods of establishing venue in a county," demonstrated an "intent to furnish prosecutors with flexibility in presenting gang-related cases that involve activity that touches upon more than one county."

In a reply brief, appellant contends that he did not waive this issue because he made a timely objection to the improper venue. He argues that a motion to dismiss for improper venue is not a mandatory motion required to be filed within the requisite 30-day time period set out in Maryland Rule 4-252(b). Appellant asserts that the State had "plenty of time" to address the argument prior to trial.

---

of ammunition; and (13) wearing, carrying, and transporting a handgun. The motion to dismiss for improper venue did not challenge venue in Baltimore County for counts one through five and fourteen through nineteen, which included the drug charges and the charges related to the gang.

17

## A.

## Proceedings Below

On September 18, 2018, appellant's counsel filed a notice of appearance.[8] On November 8, 2018, 51 days later, appellant filed a motion to dismiss for improper venue, arguing that Baltimore County lacked authority to preside over the charges related to the shooting, which "unquestionably took place in Baltimore City, Maryland."[9] Appellant argued that there was no allegation that the homicide was connected to gang-related activity, as there was only a factual allegation that members of a gang helped appellant conceal his identity after the killing, "which would be a separate offense entirely." Appellant also filed a motion for severance, arguing that "[i]t would be highly prejudicial to force [appellant] to trial on a defense of a homicide charge when there is a multitude of other separate distinct actions which have nothing whatsoever to do with the homicide charge and are allegedly gang related."

---

[8] That same day, appellant also filed an omnibus motion under Maryland Rule 4-252, which included only conclusory statements, including that "the indictment/information is defective." The motion did not raise the issue of improper venue, nor did it otherwise comply with the Rule. *See Sinclair v. State*, 444 Md. 16, 31 (2015) (noting that, although an omnibus motion may have been timely filed, it did not specifically seek suppression of evidence derived from a cell phone, nor did it "provide factual allegations or legal authority to support such an action"). The circuit court stated at a hearing relating to the joinder of defendants that "an omnibus motion doesn't preserve anything," and appellant has not argued on appeal that this motion satisfied Maryland Rule 4-252.

[9] Although the motion was titled as one to transfer jurisdiction, appellant later clarified at the motions hearing that this was a motion to dismiss for improper venue, not jurisdiction.

On December 3, 2018, the State filed an opposition to appellant's motion regarding improper venue. The State argued that the challenge to venue was untimely because appellant failed to file his motion within 30 days of the initial appearance by counsel, as required by Maryland Rule 4-252. It noted that the only way appellant could raise the issue at that point was if he provided, and the court found, good cause. The State noted that appellant had not asserted good cause and argued that good cause did not exist. On the merits, the State argued that venue was proper in Baltimore County pursuant to CR § 9-807, and it opposed the motion for severance.

On April 23, 2019, the circuit court held a hearing on both motions. Appellant argued that Baltimore County was an improper venue for the murder and related crimes that occurred in Baltimore City because there was no nexus between the crimes and any alleged gang activity. He asserted that, at the very most, there was evidence that he had contacts with gang members, and that the weapon used might be connected to the gang, but that did not show that he was a part of the gang.

The State addressed the severance issue first, and it then moved to the merits of the venue motion. It argued that the murder and robbery of Mr. Dvorak were connected to appellant's association with the gang, and therefore, venue was permitted in Baltimore County under CR § 9-807.

Following the hearing, the circuit court issued its ruling. It denied the motion for severance, finding that the evidence in the homicide and gang prosecutions would be "mutually admissible," that trying the charges together would not unfairly prejudice appellant, and that a single trial on all charges promoted judicial economy. The court

19

denied the motion to dismiss for improper venue, stating that it was "persuaded that venue is appropriate in Baltimore County."

**B.**

**Analysis**

Before addressing the parties' specific contentions, we note that

> [t]here are two facets to the jurisdiction of a court–jurisdiction over the subject matter and venue. With respect to the subject matter, within its county, a circuit court of this State has full common law jurisdiction in all criminal cases committed in Maryland except where limited by law. . . . Venue, however, is the place of trial, or where a criminal trial may properly occur.

*McBurney v. State*, 280 Md. 21, 31 (1977). *Accord State v. Butler*, 353 Md. 67, 73 (1999) ("Venue . . . pertains to the county in which a case can be tried; territorial jurisdiction concerns whether the offense was committed within the boundaries of the State."). Venue is not a fundamental right, and it "may be altered by the legislature and may be waived, either expressly or by failure to make a timely objection." *Smith v. State*, 116 Md. App. 43, 57, *cert. denied*, 347 Md. 254 (1997). *Accord Kisner v. State*, 209 Md. 524, 527 (1956) ("[A]lthough jurisdiction of the subject matter cannot be conferred by consent, venue or jurisdiction of the person may be waived in a criminal case.").

We begin with the State's waiver argument. As the State notes, Maryland Rule 4-252(b) provides that a mandatory motion "shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court." Because counsel filed the motion relating to improper venue on November 8, 2018, 51 days

20

after counsel filed a notice of appearance on September 18, 2018, the State argues that the issue of improper venue has been waived.

Maryland Rule 4-252(a) sets forth the mandatory motions in criminal cases that must be filed within the 30-day requirement, as follows:

(1) A defect in the institution of the prosecution;

(2) A defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense;

(3) An unlawful search, seizure, interception of wire or oral communication, or pretrial identification;

(4) An unlawfully obtained admission, statement, or confession; and

(5) A request for joint or separate trial of defendants or offenses.

Maryland Rule 4-252(d) states that "[a]ny other defense, objection, or request capable of determination before trial without trial of the general issue, shall be raised by motion filed at any time before trial." "The Rule is designed to facilitate the fair consideration of a [mandatory] motion in advance of trial." *Sinclair v. State*, 444 Md. 16, 29 (2015).

Appellant does not dispute that the motion for improper venue was not filed within the requisite 30-day time period. He contends, however, that a motion relating to improper venue is not a mandatory motion encompassed by Maryland Rule 4-252(a). We disagree.

Appellant notes that, in *Smith*, 116 Md. App. at 53, this Court stated that "[i]mproper venue is a *'defense or objection'* which, under Md. Rule 4–252, *must be raised by motion before trial*." (Emphasis added). "If the issue is not raised in a timely motion it is waived." *Id.*

21

The State points us to another case from this Court, in which we held: "A motion objecting to venue is one of those *mandatory motions* that must be raised before trial, pursuant to Maryland Rule 4–252." *Spencer v. State*, 76 Md. App. 71, 81 (1988) (emphasis added). In *Spencer*, this Court held that a challenge to venue was waived where Spencer "interposed no objection either to the jurisdiction of the court or to the venue until the close of the State's case when [he] moved for judgment of acquittal on both of those grounds." *Id.* This Court noted that an objection to venue is waivable "expressly or by failure to make a timely objection." *Id.* (quoting *McBurney*, 280 Md. at 32–33).

In interpreting Maryland Rule 4-252, we note that it "was drafted 'as a matter of judicial policy,' to be parallel to Fed. R. Crim. P. 12." *Carroll v. State*, 202 Md. App. 487, 513 (2011) (quoting *Kohr v. State*, 40 Md. App. 92, 98 (1978)), *aff'd*, 428 Md. 679 (2012). The federal rule includes, in the category of "a defect in instituting the prosecution," the following:

(i) **improper venue**;

(ii) preindictment delay;

(iii) a violation of the constitutional right to a speedy trial;

(iv) selective or vindictive prosecution; and

(v) an error in the grand-jury proceeding or preliminary hearing[.]

Fed. R. Crim. P. 12(3)(A) (emphasis added). *See also State v. Haines*, 620 A.2d 875, 877 n.6 (Me. 1993) (claims of improper venue are included in the category of defects in the institution of the prosecution).

22

Accordingly, as this Court stated in *Spencer*, 76 Md. App. at 81, a motion for improper venue is a mandatory motion, and pursuant to Maryland Rule 4-252(a), it must be filed "within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court." There is no question that this was not done in this case.

There are, however, situations where a court can exercise its discretion to consider an untimely motion. Maryland Rule 4-252(a) provides that a matter required to be made by a mandatory motion, if not raised in conformity with the Rule, is "waived unless the court, for good cause shown, orders otherwise." The defendant bears the burden of showing good cause. *Davis v. State*, 100 Md. App. 369, 385 (1994).

Here, counsel for appellant raised the issue of good cause for the first time during oral argument in this Court. She asserted that, given the extensive evidence involved in this case, defense counsel, a solo practitioner, did not have enough time to be prepared to file the motion earlier than it was filed, and therefore, there was good cause to consider the motion. Counsel argued that this Court could conclude that the circuit court implicitly found good cause to consider the untimely motion because the court addressed the motion on the merits.

The case of *Sinclair v. State*, 214 Md. App. 309, 324 (2013), *aff'd*, 444 Md. 16 (2015), is instructive on this issue. In that case, the prosecutor objected to an untimely suppression motion, stating that "time has been passed [sic]." *Id.* The trial court then addressed the motion on the merits. *Id.* On appeal, this Court held that the circuit court "must have found either that the appellant had not waived his right to raise the issue or, if it understood that the State was objecting on a failure to comply with the time requirements

23

of Maryland Rule 4–252, that there was good cause to hear the motion." *Id.* at 324–25. We stated that, "[a]lthough the court did not articulate its reasoning for considering and ruling on the motion, silence on the issue [did] not imply an abuse of discretion," noting that "[w]e presume judges to know the law and apply it, even in the absence of a verbal indication of having considered it." *Id.* at 325 (citation omitted).

The Supreme Court of Maryland disagreed. *Sinclair*, 444 Md. at 30.[10] It agreed that a circuit court had discretion "to hear noncompliant motions 'for good cause shown,'" and that it generally would not disturb the exercise of such discretion, "'at least where the State is not unduly prejudiced.'" *Id.* (quoting *Denicolis v. State*, 378 Md. 646, 660 (2003)). The Court noted, however, that defense counsel had not given any reason for failing to comply with the Rule, and that court did not make a finding of good cause. *Id.* at 32. Under these circumstances, the Court disagreed that the circuit court implicitly found good cause to hear the belated motion, stating that "there must be a basis for such a finding and none is evident in this record." *Id.* at 33. Because there was no showing or finding of good cause, the defense waived the issue. *Id.* at 33, 36.

Similarly, here, defense counsel below did not argue to the circuit court any reason for failing to comply with the Rule, and the court did not make a finding of good cause on the record. Thus, following the reasoning in *Sinclair*, the issue of improper venue is waived. Moreover, in this case, appellant did not raise good cause on appeal until oral

---

[10] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

argument, despite filing an original brief and a reply brief. *See Ruiz v. Kinoshita*, 239 Md. App. 395, 435 n.15 (2018) (declining to consider an argument raised for the first time at oral argument); *Uninsured Employers' Fund v. Danner*, 388 Md. 649, 664 n.15 (2005) (the Court need not address arguments raised at oral argument that were not briefed on appeal). Under these circumstances, the issue of improper venue is waived, and we will not address it on the merits.

## II.

## Motion for Judgment of Acquittal

Appellant's next claim is that the court erred in denying his motion for judgment of acquittal on the charge of participation in a criminal organization that resulted in death. Pursuant to CR § 9-804(a), it is unlawful for an individual to (1) "participate in a criminal organization knowing that the members of the criminal organization engage in a pattern of organized crime activity," and (2) "knowingly and willfully direct or participate in an underlying crime . . . committed for the benefit of, at the direction of, or in association with a criminal organization."[11] Pursuant to CR § 9-804(e): "A person may not violate subsection (a) of this section that results in the death of a victim."

---

[11] CR § 9-801(c) defines a criminal organization as an enterprise whose members:

> (1) individually or collectively engage in a pattern of organized crime activity;
>
> (2) have as one of their primary objectives or activities the commission of one or more underlying crimes, including acts by juveniles that would be underlying crimes if committed by adults; and

To sustain a conviction under CR § 9-804(e), participation in a criminal organization that results in death, the State must prove four elements. First, an individual participated in a criminal organization knowing that the members engage in a pattern of organized criminal activity. Second, the individual knowingly and willfully directed or participated in an underlying crime. Third, the crime was committed "*for the benefit of, at the direction of, or in association with*" a criminal organization. Fourth, the crime resulted in the death of the victim.

Appellant does not challenge the first, second, or fourth elements of the crime, i.e., that he was a member of "500," that he participated in the robbery, and that this act resulted in the death of Mr. Dvorak. Appellant challenges only the third requirement. He argues that the circuit court "committed reversible error by denying his motion for judgment of acquittal on the charge of participation in [a criminal organization that resulted] in death" because "[t]he [S]tate failed to present any evidence, direct or circumstantial, that the robbery and murder of [Mr.] Dvorak were committed for the benefit of, at the direction of or in association with the group '500.'" In support, he states that "the shooting was committed with an individual who had no association with the group, that the shooting was committed outside the area where the group conducted their 'criminal activity,' and that the offenses were committed without the permission or knowledge of the '500' group members and leaders."

---

(3) have in common an overt or covert organizational or command structure.

26

The State contends that the evidence was sufficient to support appellant's conviction for knowingly participating in a crime, which was committed for the benefit of or in association with a criminal organization and resulted in the death of Mr. Dvorak. It argues that there was evidence that the crime was committed "in association with the gang" because appellant used a gun provided by a gang leader and he sought help from the gang afterwards. It asserts that the jury could infer from the evidence that appellant "had tacit permission to use the gun and commit other crimes for the benefit of the gang," and that appellant gave the "proceeds" of the robbery, i.e., Mr. Dvorak's cell phone and Nintendo Switch, to the gang.

Initially, we note that appellate review of the sufficiency of the evidence "is available only when the defendant moves for judgment of acquittal at the close of all the evidence and argues precisely the ways in which the evidence is lacking." *Anthony v. State*, 117 Md. App. 119, 126, *cert. denied*, 348 Md. 205 (1997). *Accord Howard v. State*, 232 Md. App. 125, 169 (claim not preserved where appellant failed to first raise it on motion for judgment of acquittal), *cert. denied*, 453 Md. 366 (2017). A criminal defendant "is not entitled to appellate review of reasons stated for the first time on appeal." *Starr v. State*, 405 Md. 293, 302 (2008).

Here, appellant moved for judgment of acquittal on "the charge of murder in the first-degree," asserting that venue was improper because the homicide took place in Baltimore City. Discussions then ensued about venue, and the court said, "it's a little late for that." At no time in the motion for judgment did appellant specifically mention the charge of participation in a criminal organization that resulted in a death.

27

An argument could be made that the issue of sufficiency of the evidence of the charge of participation in a criminal organization that resulted in a death is not preserved for this Court's review. The State, however, did not make this argument in its brief or at oral argument on appeal.[12] Moreover, appellant did assert below, as he does on appeal, that there was no evidence that the shooting was related to the gang or "enveloped within the gang charge," and the trial court said that the argument "with regard to the homicide as a connection to the gang" was something counsel could argue "in closing." Accordingly, we will consider the issue on its merits.

When assessing a challenge to the sufficiency of the evidence, we assess "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. McGagh*, 472 Md. 168, 184 (2021). "We do not measure the weight of the evidence; rather, our concern is only whether the verdict was supported by sufficient evidence, direct or circumstantial, which could fairly convince a trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt." *Taylor v. State*, 346 Md. 452, 457 (1997). A valid conviction may be based solely on circumstantial evidence. *Wilson v. State*, 319 Md. 530, 536 (1990). Thus, the limited question for our review is "not whether the evidence *should have or probably would have* persuaded the majority of fact

---

[12] The State did note, in response to the motion for a new trial on this ground, that the motion for judgment of acquittal did not mention the charge for participation in a criminal organization that resulted in death. It did not, however, raise preservation as an issue in this appeal.

28

finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Allen v. State*, 158 Md. App. 194, 249 (2004) (emphasis in original).

In determining whether the evidence was sufficient for the jury to find that appellant committed the murder "for the benefit of, at the direction of, or in association with" the gang, we make a couple of preliminary observations. Initially, we note that the phrase "for the benefit of, at the direction of, or in association with" uses the disjunctive word "or," and therefore, only one of these elements must be shown. *See Stancil v. State*, 78 Md. App. 376, 385 (Where the "kidnapping statute sets forth in the disjunctive more than one means to accomplish the crime, proof of any one of them is sufficient to sustain the charge."), *cert. denied*, 315 Md. 692 (1989). Additionally, there is no argument, and no evidence to the support an argument, that the murder and robbery were committed "at the direction of" the gang.

We thus turn to address whether there was sufficient evidence that the crime was committed "for the benefit of" or "in association with" the gang. In doing so, we must assess the meaning of those terms.

In construing the specific terms of the statute at issue here, our goal is to ascertain the intent of the General Assembly in enacting the statute. *See Shivers v. State*, 256 Md. App. 639, 658 (2023) ("'When undertaking an exercise in statutory interpretation, we start with the cardinal rule of statutory interpretation—to ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute.'") (quoting *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021)). "Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language dictates

29

interpretation of its terminology." *Schreyer v. Chaplain*, 416 Md. 94, 101 (2010). "When the words of the statute are ambiguous, we resolve the ambiguity using a wider range of interpretive aids, including legislative history, prior case law, statutory purpose and statutory structure." *Fisher v. E. Corr. Inst.*, 425 Md. 699, 707 (2012).

We note that CR § 9-804 does not define the terms "for the benefit of" or "in association with" a criminal organization, and the Maryland appellate courts have not previously addressed the meaning of these terms. California, however, has a statute using similar terms. California Penal Code § 186.22(b)(1) provides an enhanced sentence for "a person who is convicted of a felony committed *for the benefit of, at the direction of, or in association with* a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (Emphasis added).[13] The Supreme Court of California has explained that this language was included to make it clear that the crime must be "gang related." *People v. Albillar*, 244 P.3d 1062, 1071 (Cal. 2010). "Not every crime committed by gang members is related to a gang." *Id.*

We begin with the term "in association with" because the State argues most strenuously that the evidence showed that the crime was committed "in association with" the gang. "In determining the plain meaning of statutory language, reference to dictionaries is appropriate." *In re Abhishek I.*, 255 Md. App. 464, 473 (2022). *Merriam-Webster Dictionary* defines the term "in association with" as "in connection with or together with."

---

[13] CR § 9-804 does not include the requirement in California Penal Code § 186.22 that the person commit the crime "with the specific intent to promote, further, or assist in criminal conduct by gang members."

MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary (last updated June 21, 2023).

California courts similarly have construed the term "in association with" to mean "a connection or an association between the crime and the gang." *People v. Soriano*, 279 Cal. Rptr. 3d 569, 575 (Cal. Ct. App. 2021). "Committing a crime in concert with known gang members can be substantial evidence that the crime was committed in 'association' with a gang." *People v. Garcia*, 199 Cal. Rptr. 3d 399, 413 (Cal. Ct. App. 2016). A crime is committed "in association with" the gang if the "'defendants relied on their common gang membership and the apparatus of the gang in committing' the charged felonies." *Id.* (quoting *Albillar*, 244 P.3d at 1071).

In *Albillar*, 244 P.3d at 1071, the Supreme Court of California held that, when gang members acted in concert to commit a sex offense against a victim, they "relied on their common gang membership and the apparatus of the gang in committing" the crimes. The court held:

> Defendants not only actively assisted each other in committing these crimes, but their common gang membership ensured that they could rely on each other's cooperation in committing these crimes and that they would benefit from committing them together. They relied on the gang's internal code to ensure that none of them would cooperate with the police and on the gang's reputation to ensure that the victim did not contact the police. We therefore find substantial evidence that defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang.

*Id.* at 1072.

Other California cases have noted that, "where multiple gang members were involved in the charged offense, the fact of their joint involvement in a crime often provides

31

sufficient evidence of association." *People v. Renteria*, 515 P.3d 77, 85 (Cal. 2022). At least one other court similarly has held that evidence that a gang member acts "in concert" with another gang member in committing a crime permits an inference that the act was committed "in association with the gang." *Morris v. Commonwealth*, 716 S.E.2d 139, 141–42 (Va. Ct. App. 2011).

Here, appellant did not commit the robbery and murder "in concert" with another gang member. Although the robbery and murder involved two people, Mr. Hicks was not a member of "500."

The State contends, however, that there was evidence that appellant committed the robbery and murder "in association with" the gang because he obtained the gun used to rob and kill Mr. Dvorak from a gang leader, based on his association with the gang, and this gang gun facilitated the commission of the crime. Moreover, after the crime, the gang gave protection to appellant by helping him dispose of the gun in a gun swap and advised him on how to avoid apprehension.

Although we have not been directed to, nor have we found, a case involving similar facts, we agree that the evidence permitted the jury to find that appellant committed the robbery and murder of Mr. Dvorak "in association with" the gang. Sergeant Landsman, an expert in gangs, testified that Mr. Dvorak's murder was gang-related because: (1) appellant got access to the firearm through the gang; (2) he took items back to the gang's territory; (3) he returned the gang firearm to the members of the gang; and (4) he sought advice on how to avoid police detection. He stated that none of these events would have occurred unless appellant was a member of the gang. Sergeant Landsman also testified that

32

communal guns were used by the gang for "protection, intimidation, and to commit crimes." If a higher-ranking gang member gave a lower ranking member a gun, that conveyed authorization to use it to commit crimes, with the expectation that it would be returned.

Other evidence corroborated Sergeant Landsman's testimony that the crime was gang-related. Mr. Randle testified that higher ranking members of the gang would give their gun to a lower ranking member to protect themselves while they sold drugs. He stated that giving someone a personal gun did not authorize them to use it, but "[w]hat they do with it, they do with it."

The Supreme Court of California has concluded that conduct is gang-related and committed "in association with" the gang if the defendants relied on other gang members or "the apparatus of the gang" in committing the act. *Albillar*, 244 P.3d at 1071. We agree with the California Supreme Court's interpretation of the term "in association with," and we similarly hold that a crime is committed "in association with" a criminal organization if it is committed either with other gang members or with "the apparatus of the gang."

The court in *Albillar* did not define the word "apparatus." Dictionaries, however, define the word as a machine, device, materials, instrument, or equipment. *See* BLACK'S LAW DICTIONARY 120 (11th ed. 2019) (defining "apparatus" as a machine or device); MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary (last updated June 18, 2023) (defining "apparatus" as an instrument or "a set of materials or equipment"). Based on this definition, a weapon used to commit a crime constitutes an apparatus. We hold that, if a crime is committed with a weapon supplied by a criminal organization, that

33

fact supports a jury finding that the crime was committed "in association with" a criminal organization.[14]

Here, there was evidence that appellant used a gun provided by the gang to rob and murder Mr. Dvorak. Sergeant Landsman gave his expert opinion that this fact, as well as the assistance of the gang after the shooting, indicated that the robbery and murder were gang-related. The evidence was sufficient to support appellant's conviction of participation in a criminal organization that resulted in the death of Mr. Dvorak.[15]

## III.

## Voir Dire Question

Appellant's final argument is that the circuit court committed plain error in asking prospective jurors during voir dire the following compound question: "Is there any member of the panel who is so prejudiced concerning firearms that you would be unable to render a fair and impartial verdict?" He asserts that asking the question in this way affected his right to a fair and impartial trial. Appellant concedes that this issue is not preserved for review because he did not object below, but he urges this Court to "exercise its discretion to review [the] unpreserved allegations through the doctrine of 'plain error.'"

---

[14] We need not address in this case whether that fact alone is sufficient to support a finding that the crime was committed "in association with" a criminal organization because, as discussed, there was additional evidence of gang assistance after the shooting.

[15] Because we conclude that the evidence was sufficient to support a finding that the crime was committed "in association with" the gang, we will not address whether it was committed "for the benefit of" the gang.

The State contends that appellant's "claim is ineligible for plain error review because the error was intentionally relinquished or abandoned." It asserts that appellant not only failed to object to the question, but he "affirmatively waived the issue by requesting the allegedly improper question." Because he "invited the error," he cannot seek plain error review. The State argues that this Court "should decline to review the voir dire for plain error."

Ordinarily, an appellate court will not decide any issue "unless it plainly appears by the record to have been raised in or decided by the trial court." Md. Rule 8-131(a). *Accord Reyes v. State*, 257 Md. App. 596, 636 n.23 (2023). "To preserve successfully a 'claim involving a trial court's decision about whether to propound a voir dire question, a defendant must object to the court's ruling.'" *Robson v. State*, 257 Md. App. 421, 459 (quoting *Foster v. State*, 247 Md. App. 642, 647 (2020)), *cert. denied*, ___ Md. ___ (2023). As this Court has explained: "The purpose of the preservation requirement is to preserve the integrity and the efficiency of the trial itself," and eliminate any necessity for appellate review. *Id.* at 460. The purpose of the preservation rule is to avoid error because, if counsel alerts the court to an error, the court typically has the opportunity to remedy it. *Id.* at 460–61.

Although this Court has discretion to review unpreserved errors, "appellate courts should rarely exercise" this discretion. *Chaney v. State*, 397 Md. 460, 468 (2007). *Accord Kelly v. State*, 195 Md. App. 403, 431 (2010), *cert. denied*, 417 Md. 502, *cert. denied*, 563 U.S. 947 (2011). Plain error review should not be employed except in those instances when an unobjected-to error can be characterized as "compelling, extraordinary, exceptional or

35

fundamental to assure the defendant a fair trial." *Stone v. State*, 178 Md. App. 428, 451 (2008) (cleaned up). *Accord Morris v. State*, 153 Md. App. 480, 507 (2003) (appellate review based on plain error is "a rare, rare, phenomenon."), *cert. denied*, 380 Md. 618 (2004); *Steward v. State*, 218 Md. App. 550, 566–67, *cert. denied*, 441 Md. 63 (2014).

For an error to be eligible for plain error review, it must meet three conditions: (1) the error must not have been "intentionally relinquished or abandoned, i.e., affirmatively waived"; (2) the error must be "clear or obvious rather than subject to a reasonable dispute"; and (3) the error must have affected the "substantial rights" of the appellant, which means "he must demonstrate that it affected the outcome of the district court proceedings." *State v. Rich*, 415 Md. 567, 578 (2010) (cleaned up). Even if these three requirements are met, this Court should exercise its discretion to review the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id. Accord Beckwitt v. State*, 477 Md. 398, 464, *cert. denied*, 143 S. Ct. 216 (2022).

Plain error review is not warranted in this case. Appellant not only failed to object to the question, he invited the error by asking the court to give the voir dire question at issue.[16] "'[W]here a party invites the trial court to commit error, he cannot later cry foul on appeal.'" *Hayes v. State*, 217 Md. App. 159, 172 (2014) (quoting *Rich*, 415 Md. at 575).

---

[16] Appellant requested the following question: "There will be testimony about the possession and/or use of firearms. Is there any [prospective] juror who is so prejudiced concerning firearms that they would be unable to render a fair and impartial verdict?" The question that the circuit court asked during voir dire was almost identical: "There will be testimony about the possession and/or use of firearms. Is there any member of the panel who is so prejudiced concerning firearms that you would be unable to render a fair and impartial verdict?"

*Accord In re Jeannette L.*, 71 Md. App. 70, 81 ("It is with ill grace that they now complain they should not have gotten that for which they asked."), *cert denied*, 310 Md. 491 (1987). We decline to exercise our discretion to review this claim for plain error.

                                  **JUDGMENTS OF THE CIRCUIT COURT
                                  FOR BALTIMORE COUNTY AFFIRMED,
                                  COSTS TO BE PAID BY APPELLANT.**